McGILVRA AND BRESSLER,[1] *v.* ROSS, STATE LAND COMMISSIONER OF THE STATE OF WASHINGTON.

APPEAL FROM THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 328.   Argued October 19, 20, 1909.—Decided November 15, 1909.

While the construction of the act of Congress under which a patent issued and what rights passed under the patent present Federal questions which give the Circuit Court jurisdiction of the case as one arising under the laws of the United States, if prior decisions have so defined such rights that they are removed from controversy, jurisdiction does not exist in the absence of diverse citizenship.

The decision in *Shively* v. *Bowlby*, 152 U. S. 1, which determined the relative rights of a patentee of the United States and one holding under a conveyance from the State of land below high watermark applies equally to lands bordering on navigable waters, whether tidal or inland, and the test of navigability is one of fact.

Each State has full jurisdiction over the lands within its borders including the beds of streams and other waters, *Kansas* v. *Colorado*, 206 U. S. 46, 93, subject to the rights granted by the Constitution to the United States.

---

[1] In the Circuit Court separate cases were instituted by McGilvra and Bressler, respectively.

Where the Circuit Court is without jurisdiction because the Federal
   questions presented by the bill are no longer open to discussion it
   should dismiss the bill and not decide it on the merits in order that
   the plaintiff's rights, if any, may be litigated in the state courts.
164 Fed. Rep. 604, affirmed as to lack of jurisdiction and case remanded
   for dismissal.

THESE cases were consolidated in the Circuit Court. The
appellants were complainants in the suits respectively, and
asserted title by virtue of patents from the United States to
lands bordering on and touching Lakes Washington and Union
in the State of Washington to the lands below the high-water
mark of said lakes respectively, against a title claimed by the
State. The appellee, James P. Agnew, is the auditor of the
county of King, and the other appellees constitute the board
of land commissioners of the State.

The fundamental question presented is whether rights be-
low high-water mark passed to the patentees as appurtenant
to the uplands conveyed to them or whether they vested in the
State upon its admission into the Union and are subject to the
control of the State.

The patent in the *McGilvra case* was issued in 1866, under
the act of Congress of April 24, 1820, entitled "An act making
further provisions for the sale of public lands;" that in the
*Bressler case* was issued under the provisions of the act of Con-
gress of September 27, 1850, entitled "An act to create the
office of surveyor of the public lands in Oregon, and to provide
for the survey and to make donations to the settlers of the
said public land." It is alleged that the lakes are respectively
non-tidal bodies of water, situated wholly within the county of
King, Lake Washington being about twenty miles in length,
with an average breadth of three miles, and Lake Union being
about three miles in length, with an average breadth of one
mile; and that neither lake has an outlet, navigable for boats,
scows or lighters, and at all times has been confined to the con-
veyance of passengers or freight to and from different points
upon said lake; and that neither lake is now or ever has been

susceptible of navigation, so far as the carrying of passengers or freight is concerned, to points upon the lake from different counties of the State, to and from other States, or to and from foreign nations, and that the same can never be used unless it be by a very extensive system of canals or dredging of the outlet thereof.

It is alleged that the height of the waters of Lake Washington is dependent upon the amount of rainfall, and that the rise and fall of the water "covers and uncovers many hundreds of thousands of square feet of land" in the patented tracts, exceeding the value of $40,000. As to Lake Union, it is alleged that, by a dam constructed about fifty years ago, its waters were raised and are maintained about seven feet higher than their natural level. And further, that a ditch has been excavated, crossing a narrow neck of land which separates Lake Union from Lake Washington, through which the waters of the latter flow into Lake Union and keep its waters at practically the same level.

It is further alleged that by virtue of the patents and the acts of Congress under which they were issued there became vested in the patentees and their successors the ownership of those portions of the lakes immediately in front of the tracts patented "out into" the "deep waters" of the lakes, subject only to the supervision in their use of the same to the extent that they be so used by the proprietor thereof; that said proprietor should not and did not interfere with the rights of other riparian owners, and the rights of the public in navigating the waters of said lake. And that they became and are vested from the dates of the several patents with the exclusive right and privilege to make such fills in shallow water, and to erect such piers, docks and warehouses as might be convenient and necessary to aid and facilitate the navigation upon the waters of the lakes, and that said rights were so vested, "limited only by the rights of supervision in the Government; that said rights be exercised in such a manner that there should be no interference with the rights of other riparian owners, or with

the rights of the public to freely navigate upon the navigable waters of said lake," and that these rights were conveyed by the patents many years before the admission of Washington into the Union.

It is alleged that the State was admitted into the Union, November 11, 1889, and that Article XVII of the constitution of the State reads as follows:

"The State of Washington asserts its ownership to the beds and shores of all navigable waters in the State up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: provided, that this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the State."

That by virtue of this provision the State claims the ownership in fee of all the waters and lands under the waters of the lakes up to and including the line of ordinary high water, and by reason of such claim of ownership the legislature passed Senate Bill No. 101, which was approved by the governor February 4, 1907, and took effect immediately upon its passage. The act was entitled "An act to provide for the establishment of harbor lines, survey, platting and appraisal of shore lands of the first class of Lakes Washington and Union, in King County, Washington, the sale and disposition of said shore lands, the creation of the Alaska-Yukon-Pacific Exposition Fund, and declaring an emergency."

It is also alleged that it is provided in said act that "the board of state land commissioners of the State of Washington, acting as a board of harbor line commission or other proper official capacity as now authorized by law, shall, as soon as possible after the passage of this act, and not later than July 1, 1907, establish harbor lines in Lakes Washington and Union, situated in King County, Washington, in front of the city of Seattle, . . . ; and to survey, plat, examine and appraise such shore lands of the first class within or in front of the

limits of the said city of Seattle . . . After the establishment of said harbor lines and the survey, platting, examination and appraisal, as aforesaid, a copy of the plat and record thereof, as required by existing law, shall be deposited with the county auditor of King County, Washington, and another copy shall be delivered to the commissioner of public lands of this State, and the same shall be filed and safely kept as required by law."

It is further alleged that the board has proceeded to survey the lands belonging to the appellants respectively, and has included therein those portions which lie between the line of ordinary high water and the line of low water out into the lakes to a point where the depth is thirty feet, and that the plat thereof covers the property of the appellees.

It is alleged that John J. McGilvra, the original patentee in the *McGilvra case*, "did erect and construct out into the waters of Lake Washington a wharf in front of a portion" of the patented lands, which was erected and maintained at great expense to facilitate the commerce of the lake, and which was for many years the only wharf within the limits of Seattle. It is alleged that the wharf is still owned by the appellants in the case, and still used for the purpose above mentioned, and is, with the privilege connected therewith and appurtenant thereto, of greater value than $10,000.

It is also alleged in the *Bressler case* that the owners of the lands alleged therein to have been patented constructed a dock or wharf into the waters of Lake Union, for a landing place for passengers and freight, and it was and is used for that purpose, and that the appellant Bressler has, since his ownership of the property, further improved the same, by covering nearly all of it with buildings, which have long been occupied by his tenants for the purpose of trade and manufacture, and the value of the wharf and buildings exceeds $12,000, and the value of the property $75,000.

It is alleged, in both cases, that by the constitutional provision above mentioned the State "seeks to confiscate without

compensation, and if declared valid and of effect will confiscate without compensation the rights of" appellants in and to all the rights hereinbefore set forth as vested for a period of twenty-four years before the admission of the State, and will divest appellants of their said property rights without compensation and without due process of law, all of which, it "is alleged, is contrary to the protection guaranteed to the citizens of the United States by the Fourteenth Amendment of the Constitution of the United States."

And as to the acts and threatened acts of the appellees above described and other acts which they threaten in pursuance of the statute of February 4, 1907, it is alleged that they will cast a cloud upon the respective rights, titles and properties of the appellants in the respective cases, to their damage respectively in the sums of $5,000, $25,000 and $100,000, and that they will take and convert into money the properties of the respective appellants without compensation and without due process of law, and that appellants have no plain, speedy or adequate remedy at law.

Injunctions were prayed, provisional and perpetual, also general relief.

Demurrers were filed to the bills on the ground that they exhibited no equities in the respective complaints and on the ground that the court was "without jurisdiction of the parties or the subject matter."

Alfred J. Pritchard and others were allowed to intervene in the *McGilvra* case and Frank T. Hunter and others were allowed to intervene in the *Bressler case* as parties complainant.

The Circuit Court did not pass on the question of jurisdiction, saying, on page 401: "As the bills fully disclose the extent of the complainants' claims to relief, it results that the demurrers must be sustained and the suits dismissed for want of equity." 161 Fed. Rep. 398. A decree was entered accordingly. The Circuit Court of Appeals, however, discussed the question of jurisdiction, and said, on page 608:

"The Circuit Court was, therefore, without jurisdiction in

these cases and the bills of complaint were properly dismissed. The views here expressed would require this court to affirm the decrees of the Circuit Court dismissing the bills of complaint if the cases were considered on their merits.

"The decree of the Circuit Court is affirmed." 164 Fed. Rep. 604.

*Mr. Charles K. Jenner* and *Mr. O. C. McGilvra* for appellant.

*Mr. Walter P. Bell*, Attorney General for the State of Washington, and *Mr. John W. Roberts* for appellee.

MR. JUSTICE MCKENNA, after stating the case as above, delivered the opinion of the court.

The appellants are citizens of the State of Washington, and rely, therefore, upon the existence of Federal questions to sustain the jurisdiction of the Circuit Court. These questions are asserted to be (and we give the language of counsel): "(1) the validity and effect of the several patents of the United States in respect to the claim of ownership thereunder, as set forth in the bill of complaint; (2) the invocation of the protection of the Fourteenth Amendment of the Federal Constitution by these plaintiffs against the threatened taking of their property" by "the several acts of the legislature of the State of Washington and the procedure directed thereunder."

It is manifest that the first is the primary question. If the appellants did not derive the rights contended for by the patents, they have no rights to be impaired, even assuming, as we have assumed in this discussion, that the action of the State has proceeded far enough to be a trespass upon or an impairment of them. But whether such rights passed involves the construction of the acts of Congress under which the patents issued and necessarily of the effect of the patents, and presents a Federal question, if prior decisions have not de-

fined, such rights and removed them from controversy. This is contended by appellees, and *Shively* v. *Bowlby*, 152 U. S. 1, is cited. And, as we have seen, the Circuit Court of Appeals took this view. Appellants attack it and contend that the facts of *Shively* v. *Bowlby* are so far different from those in the case at bar as to make that case inconclusive of the questions presented in the latter. A determination of the scope of *Shively* v. *Bowlby* becomes necessary. The controversy in that case was between a title by United States patent under the Oregon Donation Land Law, so called, being the act of Congress, September 27, 1850 (and the same law under which the title in the *Bressler case* is derived), to lands bounded by the Columbia River, and a title derived under the act of the State of Oregon, entitled "An act to provide for the sale of tide and overflowed lands on the seashore and coast" to lands below high-water mark on that river. The issue, therefore, was accurately presented between a title under a patent of the United States and one conveyed by a State in the exercise of its dominion over lands below high-water mark. The issue in the case at bar is exactly the same. But a distinction is pointed out, and on that distinction appellants' contentions and arguments are based. The *Shively case* was concerned with shore lands within the ebb and flow of the tide. In the case at bar the lands border on navigable waters, but not on tidal waters. The *Shively case*, it is therefore contended, as we have said, is not applicable, for, it is said, that whenever the "court in deciding said cause used the term 'navigable waters' in discussing the case then before it said term meant tidal waters, for the question of rights upon tidal waters was the only question therein presented."

The argument to sustain the contention is not confined to an analysis of the case, but goes beyond, and by the citation of many cases seeks to determine the riparian rights of appellants by the common law test of navigability, to wit, the ebb and flow of the tide. The contention is that when the patents were issued to the respective appellants "the common law of Eng-

land in relation to riparian ownership was in full force in the Territory of Washington, and, in the absence of statutes passed by the United States, changing, modifying or varying the common law in regard to grants of land," such grants carried, unless there was an express reservation, as "appurtenances thereunto belonging" such riparian ownership, and from this it is contended that appellants "received with their several patents a grant in fee to the waters" of Lakes Union and Washington, respectively, "in front of the several tracts of land to the middle of said lakes." We will not review the reasoning by which this contention is attempted to be supported. It is enough to say that the test of navigability of waters insisted on has had no place in American jurisprudence since the decision in the case of *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, and is therefore no test of riparian ownership. This is the effect of *Shively* v. *Bowlby*, 152 U. S., *supra*. The whole doctrine is there displayed, and the court declared (152 U. S., p. 11), that on account of the " diversity of view as to the scope and effect of the previous decisions of this court upon the subject of public and private rights in lands below high-water mark of navigable waters," it appeared "to be a fit occasion for a full review of those decisions and a consideration of other authorities upon the subject." And the term "navigable waters," as there used, meant waters which were navigable in fact. The definition was not inadvertent or unnecessary. It was that to which the reasoning conducted and which became the test of the dominion of the national and state governments over shore lands and the rights which they had, or could convey. Hence this conclusion by the court (p. 57): "The title and rights of riparian or littoral proprietors in the soil below high-water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution." It was observed that the United States, while it held the country as a Territory, having all the powers of national and of municipal government, might have granted for appropriate purposes rights and titles below high-

water mark. See *United States* v. *Winans*, 198 U. S. 371; *Prosser* v. *Northern Pacific R. R.*, 152 U. S. 59. But, it was said, that they had never done so by general laws, but had considered it "as most in accordance with the interest of the people and with the object for which the Territories were acquired of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the States respectively, when organized and admitted into the Union." This policy, it was remarked, as "to navigable waters and the soils under them, whether within or *above* the ebb and flow of the tide," has been "constantly acted upon." And hence it was further said: "Grants by Congress of portions of the public lands within a Territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future State when created, but leave the question of the use of the shores by the owners of uplands to the sovereign control of each State, subject only to the rights vested by the Constitution in the United States." The conclusion necessarily follows, as expressed by the court, that the State may dispose of its lands under navigable waters "free from any easement of the upland proprietor."

*Joy* v. *St. Louis*, 201 U. S. 332, is to the same effect. See also *Scranton* v. *Wheeler*, 179 U. S. 141, 190; *United States* v. *Mission Rock Co.*, 189 U. S. 391; *Kansas* v. *Colorado*, 206 U. S. 46–93. In the latter case it was said, as a deduction from many previous cases, including *Shively* v. *Bowlby*, "that each State has full jurisdiction over the lands within its borders, including the beds of streams and other waters." *Barney* v. *Keokuk*, 94 U. S. 324, 338, was quoted from as follows: "And since this court, in the case of *The Genesee Chief*, 12 How. 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters and amenable to the admiralty jurisdiction, there seems

to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water."

It follows from these views that the Circuit Court of Appeals rightly decided that the questions presented by the bill are no longer open to discussion, and that the Circuit Court was without jurisdiction. But the Circuit Court of Appeals, overlooking the fact that the decree was not of dismissal simply, but on the merits, affirmed it. To correct this inadvertence the decree of the Circuit Court of Appeals must be reversed and the cause remanded to the Circuit Court with directions to set aside the decree on the merits and sustain the demurrer for want of jurisdiction, and on that ground dismiss the suits. This will enable appellants to litigate in the state courts whatever riparian rights they may have under the laws of the State and the constitutional provisions hereinbefore set out.

*So ordered.*

MR. JUSTICE HOLMES concurs in the result.