**Robert L. PARISH et al., Plaintiffs-Appellants,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION et al., Defendants-Appellees.**

**No. 73-3748.**

United States Court of Appeals, Fifth Circuit.

Jan. 9, 1975.

---

John Gallagher, J. Peyton Moore, Shreveport, La., for plaintiffs-appellants.

Arthur R. Carmody, Jr., Samuel W. Caverlee, Shreveport, La., George H. Gangwere, Jr., Kansas City, Mo., for defendants-appellees.

Before TUTTLE, THORNBERRY and SIMPSON, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellants, five college basketball players, challenge the constitutionality of the National Collegiate Athletic Association's so-called 1.600 rule. This rule required that NCAA-affiliated schools grant athletic scholarships, first year eligibility for participation in athletics, and other benefits only to applicants who could "predict"—on the basis of their high school grade point average or class rank and their grade on one of two standardized achievement tests—a minimum 1.600 grade point average during their first year in college.[1] The NCAA adopted the 1.600 rule as a means of insuring that the athlete be an integral part of the student body and to maintain intercollegiate athletics as an integral part of the education program.

Appellants attend Centenary College, a small private college situated in Shreveport, Louisiana.[2] They were told by Centenary's athletic department that they had been recruited by Centenary in conformance with the NCAA's rules. In fact, however, the department almost certainly knew that appellants did not qualify under the 1.600 rule. After warning Centenary, both before and after the college admitted appellants

---

1. In 1973 the NCAA repealed the 1.600 rule and substituted the 2.00 rule, which requires only that an entering college freshman have earned an overall 2.00 grade point average in high school. The Seventh Circuit recently upheld the constitutionality of the 2.00 rule.

Schubert v. N.C.A.A., 506 F.2d 1402, No. 74–1282 (7 Cir. Oct. 22, 1974).

2. The district judge ordered Centenary joined as a party plaintiff to this action.

on athletic scholarships, that the young men could not be granted athletic eligibility because of the rule, the NCAA applied sanctions against Centenary.[3] These sanctions mean that unless the school declares appellants ineligible for basketball, Centenary cannot play in any NCAA sponsored tournaments or in any NCAA sanctioned televised games. Centenary refused to declare appellants ineligible; consequently they all continue to participate in regular season athletics.

Believing it likely in 1973 that Centenary's basketball team would be invited to a postseason tournament, however, appellants brought this action claiming that the NCAA's actions denied them due process and equal protection of the laws. They requested a permanent injunction forbidding the NCAA to enforce its sanctions against Centenary. The district judge granted a temporary restraining order and extended it once, but appellants permitted it to dissolve when Centenary's team received no postseason invitations. The district court later denied the NCAA's motion to dismiss,[4] but after a hearing rendered judgment in its favor on the merits.[5] We affirm.

## I.

■■ At the outset we must determine whether appellants can surmount the difficult jurisdictional barrier arguably present here. That is, we must decide whether the actions of the NCAA were taken "under color of state law" within the meaning of 42 U.S.C. § 1983 so as to confer jurisdiction on the district court under 28 U.S.C. § 1343(3).[6] With only one exception, every federal court that has considered this question has answered it affirmatively.[7] However, in McDonald v. N.C.A.A., C.D.Cal. 1974, 370 F.Supp. 625, a district court in California expressly addressed itself to the reasoning of the district court in this case and concluded that the activities of the NCAA did not constitute state action. Specifically, the court in *McDonald* rejected any reliance on the cases finding state action in the activi-

3. The NCAA placed Centenary on indefinite probation for incorrectly certifying appellants as eligible for basketball scholarships and other financial aid. Centenary could reduce the duration of its probation from indefinite to two years by "conducting its intercollegiate athletic program in accordance with all requirements and interpretations of NCAA bylaw 4–6–(b) [1.600 rule]." (App. at 57). The school declined to challenge this decision through the NCAA's own appeals procedure, which is available only to the institution and not to individual athletes.

4. Parish v. N.C.A.A., W.D.La.1973, 361 F. Supp. 1214.

5. Parish v. N.C.A.A., W.D.La.1973, 361 F. Supp. 1220.

6. The parties, as well as the district court, discuss this point in terms of the presence or absence of "state action." The semantic distinction carries no substantive consequences, however, since the "under color of state law" requirement of 42 U.S.C. § 1983 simply reflects the state action requirement of the 14th Amendment. *See* United States v. Price, 1966, 383 U.S. 787, 794–795 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267; Gibbs v. Titelman, 3 Cir. 1974, 502 F.2d 1107, 1110;

Shirley v. State National Bank of Connecticut, 2 Cir. 1974, 493 F.2d 739, 741. *But see* Lavoie v. Bigwood, 1 Cir. 1972, 457 F.2d 7, 15 ("color of state law" requirement may demand greater state involvement than "state action").

Early in the proceedings appellants sought to establish jurisdiction under 42 U.S.C. § 1981, which of course extends to private action. Because this claim was apparently abandoned at some point during the case, we intimate no view on whether § 1981 would afford a jurisdictional base for a suit like this one. In any event it would be available here to Robert Parish alone, since it proscribes only racial discrimination.

7. Associated Students, Inc. v. N.C.A.A., 9 Cir. 1974, 493 F.2d 1251, 1254–1255; Smith v. Southern Methodist University, CA–3–74–895B (N.D.Tex.1974) (unreported order); Howard University v. N.C.A.A., D.D.C.1973, 367 F.Supp. 926, 929, appeal pending, Nos. 74–1166—1169 (D.C.Cir.); Buckton v. N.C. A.A., D.Mass.1973, 366 F.Supp. 1152, 1156–1157; Curtis v. N.C.A.A., C–71 2088 ACW (N.D.Cal.1972) (unreported opinion). The Seventh Circuit did not reach the jurisdictional issue in Schubert v. N.C.A.A., *supra*.

ties of statewide high school athletic associations:[8]

> No charge is made here that the NCAA is being used by any state—or group of states, for that matter—to undertake racial discrimination in college athletics . . . . Unlike the association in *St. Augustine* [Louisiana High School Athletic Association v. St. Augustine High School, 5 Cir. 1968, 396 F.2d 224], the NCAA has an existence separate and apart from the educational system of any state.

370 F.Supp. at 631. Similarly, the court concluded that a school's voluntary adherence to the NCAA's rules would create the necessary state action only if the school itself could be termed a state instrumentality, for even

> [v]oluntary concurrence of a state in a decision of an organization (NCAA) or other body—not a state, state instrumentality, or sovereign equivalent —does not make the acts of the organization (NCAA) "state action" in a constitutional sense.

370 F.Supp. at 631. Nonetheless, despite admitted conceptual difficulties and the initial appeal of *McDonald*'s reasoning,[9] we believe that the district court in this case correctly concluded that the activities of the NCAA constitute action taken under color of state law.

We see no reason to enumerate again the contacts and the degree of participation of the various states, through their colleges and universities, with the NCAA. Suffice it to say that state-supported educational institutions and their members and officers play a substantial, although admittedly not pervasive, role in the NCAA's program.[10] State participation in or support of nominally private activity is a well recognized basis for a finding of state action. Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45; Smith v. Young Men's Christian Ass'n, 5 Cir. 1972, 462 F.2d 634. Moreover, we cannot ignore the states'—as well as the federal government's—traditional interest in all aspects of this country's educational system.[11] Organized athletics play a large role in higher education, and improved means of transportation have made it possible for any college, no matter what its location, to compete athletically with other colleges throughout the country. Hence, meaningful regulation of this aspect of education is now beyond the effective reach of any one state. In a real sense, then, the NCAA by taking upon itself the role of coordinator and overseer of college athletics—in the interest both of the individual student and of the institution he attends—is performing a traditional governmental

8. In addition to the opinions cited by the district court in this case, 361 F.Supp. at 1214, *see* Wright v. Arkansas Activities Ass'n, 8 Cir. 1974, 501 F.2d 25; Gilpin v. Kansas State High School Activities Ass'n, D.Kansas 1974, 377 F.Supp. 1233; Baltic Ind. School Dist. v. South Dakota High School Activities Ass'n, D.S.D.1973, 362 F.Supp. 780.

9. *McDonald* was decided before the Ninth Circuit issued its opinion in the *Associated Students* case, *see* note 7 *supra*, and is presumably overruled on the state action issue by that opinion.

10. *See* Parish v. N.C.A.A., *supra*, 361 F. Supp. at 1216–1219; Howard University v. N.C.A.A., *supra*, 367 F.Supp. at 928–929; Buckton v. N.C.A.A., *supra*, 366 F.Supp. at 1156–1157.
   In determining whether the NCAA's activities constitute state action in the constitu-

tional sense, it is of no significance that state-supported schools, as well as private ones, join the association voluntarily. On the other hand, because Centenary was not made a defendant here, we need not decide whether the action of a private college that voluntarily concurs in the decisions of the NCAA thereby also becomes state action.

11. As counsel for the NCAA noted at oral argument, the association was formed by persons on the strictly "educational" side of the colleges and universities, and not by the athletic departments. The large role played by the NCAA in regulating the *educational* effects of the mushrooming participation in, and expenditures on, intercollegiate sports is at least one factor distinguishing the association from other organizations of nationwide scope concerned with athletics. *See* King v. Little League Baseball, Inc., 6 Cir. 1974, 580 F.2d 264.

function. *Cf.* Evans v. Newton, 1966, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373; Terry v. Adams, 1953, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Marsh v. Alabama, 1946, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265.

Admittedly, appellants cannot point to any one state or governmental body that controls or directs the NCAA; in this sense the present case is distinguishable from the high school athletic association cases. Nevertheless, it would be strange doctrine indeed to hold that the states could avoid the restrictions placed upon them by the Constitution by banding together to form or to support a "private" organization to which they have relinquished some portion of their governmental power. *Cf.* Terry v. Adams, *supra.* We have little doubt, in light of the national (and even international) scope of collegiate athletics and the traditional governmental concern with the educational system, that were the NCAA to disappear tomorrow, government would soon step in to fill the void. In view of these circumstances we hold that the district court correctly determined that it possessed jurisdiction to hear this suit under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).

## II.

As frequently is the case, the merits of the litigation are less troublesome than the jurisdictional question. Appellants challenge the 1.600 rule on both equal protection and due process grounds. We will take up the equal protection claim first.

The district court held that "[o]bviously, the challenged action by the NCAA is not subject to strict judicial scrutiny." 361 F.Supp. at 1226. We agree. Strict scrutiny is required only when the challenged classification either impinges upon a fundamental right or discriminates against a "suspect class." San Antonio Ind. School Dist. v. Rodriguez, 1973, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16. Appellants concede that no fundamental right is involved here, but they do claim that the 1.600 rule impermissibly discriminates against some vaguely defined suspect class. Examination of appellants' briefs and their contentions at oral argument suggests at least seven potential suspect classes: (1) blacks; (2) cultural minorities; (3) the educationally deprived; (4) persons of less than average intelligence; (5) late achieving students; (6) student athletes; and (7) impecunious student athletes. Except for (1)[12] and perhaps (4),[13] these suggested classes are neither traditionally suspect, nor do they possess the features usually associated with "suspectness." Moreover, with regard to all of them appellants' case labored under the same defect, *i. e.* a total lack of probative evidence as to actual discrimination. True, appellants offered the testimony of two witnesses to the effect that the achievement tests used to predict probable success during the first year in college were culturally biased in that they were geared for white middle class students.[14] Conclusory allegations however, are no substitute for a factual showing of actual discrimina-

12. Of the five appellants, only Robert Parish is black.

13. *But see* Comment, Equal Protection and Intelligence Classifications, 26 Stan.L.Rev. 647, 655 (1974) ("The argument that intelligence classifications are invalid because they are suspect should fail").

14. The substance of one witness' testimony is revealed in the following excerpt:

Q. In your opinion, are these aptitude tests valid indicators of what a high school student might be able to do in college the first year?

A. I don't feel that any particular type test should be taken as absolute. I don't feel any particular type test should stand alone in influencing the student to enter or not enter college.

Q. What are some of the weaknesses inherent in these tests standing alone or used as predictors?

A. First of all, this is a situation where a student may be physically or emotionally disturbed. The person who gives the test may confuse the student and thereby be inadequate in giving the test. Even a broken pencil point may be inadequate. Any type of

tory intent or effect. Murray v. West Baton Rouge Parish School Board, 5 Cir. 1973, 472 F.2d 438, 444; *cf*. Baker v. Columbus Municipal Separate School Dist., 5 Cir. 1972, 462 F.2d 1112. Appellants having failed their burden of proving discrimination against some clearly defined suspect group, we decline "to extend . . . [the] most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class" whose members share only their failure to qualify under the NCAA's 1.600 rule. *See* San Antonio Ind. School Dist. v. Rodriguez, *supra*, 411 U.S. at 28, 93 S.Ct. at 1294, 36 L.Ed.2d at 40.

■ It follows that appellants are entitled to have the NCAA's challenged classification tested only under the traditional "minimum rationality" standard. Using this test a classification will be upheld if it bears some rational relationship to legitimate state purposes. We agree with the district court's finding that measured by this standard the 1.600 rule passes constitutional muster.[15] *Accord*, Associated Students, Inc. v. N.C.A.A., *supra*; Howard University v. N.C.A.A., *supra; cf*. Schubert

v. N.C.A.A., *supra*. *See also* Comment, Judicial Review of Disputes Between Athletes and the National Collegiate Athletic Association, 24 Stan.L.Rev. 903, 926 (1972).

■ Appellants' due process contentions are likewise unavailing. As the district court noted, we have held that "[t]he privilege of participating in interscholastic athletics must be deemed to fall . . . outside the protection of due process." Mitchell v. Louisiana High School Athletic Association, 5 Cir. 1970, 430 F.2d 1155, 1158. In this case, however, we need not go that far. For appellants here have lost only the opportunity to play in NCAA sponsored tournaments and televised games.[16] Whatever the status of the alleged right to participate in interscholastic athletics, in the present circumstances we discern no "property" or "liberty" interest of which appellants have been deprived because of the NCAA's enforcement of its 1.600 rule against Centenary.[17] *See* Board of Regents v. Roth, 1972, 408 U.S. 564, 569–578, 92 S.Ct. 2701, 33 L.Ed.2d 548. Accordingly, the due process clause affords them no protection.

Affirmed.

learning disability would be an indication. Some students work slower than others.
Q. Have you found in your experience any particular groups are at a disadvantage in taking them?
A. Very definitely students who have experienced educational or environmental deprivation and are from the lower socio-economic groups, in my opinion, are at a disadvantage. Children who have attended small schools or rural schools where the curriculum offered may not be adequate are at a disadvantage. Students in these categories would suffer on the tests.
Q. Are the tests geared to test any particular group?
A. Generally they are geared toward middle-class white people.
App. at 117–18. The testimony of the other witness, although bringing out other factors that might tend to skew the results of achievement tests, substantially tracked that of the first witness.

15. Because we perceive nothing "unusual" about the classification here, we have no call to embark on the "careful consideration" re-

quired by Dukes v. City of New Orleans, 5 Cir. 1974, 501 F.2d 706, 710.

16. Only Centenary has the authority to render appellants ineligible or to take away their athletic scholarships. These things the school has refused to do. Thus, the NCAA's responsibility for actions taken by the school in voluntary compliance with the association's mandate is not before us.

17. Appellants wisely abandoned at oral argument their attempt to create a property interest out of the alleged injury to their hoped-for careers in professional basketball from the inability to gain tournament experience and television exposure. Both the injury and the career are far too speculative to establish a property interest as defined in *Roth*. Moreover, appellants concede that their athletic scholarships, assuming for the moment that these would constitute a property interest requiring due process protection, *cf*. Wright v. Arkansas Activities Ass'n, *supra*, 501 F.2d at 27, remain in full effect. Hence, the NCAA's actions have caused no deprivation with regard to them.