Clifford WILEY, Plaintiff-Appellee,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION et al., Defendants-Appellants.

Nos. 76–1985 to 76–1987.

United States Court of Appeals, Tenth Circuit.

Submitted Aug. 23, 1978.

Decided Dec. 17, 1979.

474

Donald Patterson, of Fisher, Patterson, Sayler & Smith, Topeka, Kan. (with George H. Gangwere and Robert W. McKinley, of Swanson, Midgley, Gangwere, Thurlo & Clarke, Kansas City, Mo., on the brief), for defendant-appellant National Collegiate Athletic Ass'n. (and on the brief Robert E. Northrip, of Shook, Hardy & Bacon, Kansas City, Mo., and Richard L. Roberts, of Lowe, Terry & Roberts, Olathe, Kan.), for defendant-appellant Big 8 Conference.

Phillip A. Miller, Douglas County Legal Aid Society, Olathe, Kan., for plaintiff-appellee Clifford Wiley.

Before SETH, Chief Judge, and HOLLO-WAY, McWILLIAMS, BARRETT, DOYLE, McKAY, and LOGAN, Circuit Judges.

McKAY, Circuit Judge.

Wiley was a student-athlete at the University of Kansas. Coming from a desperately poor background, he sought to meet his education costs through a federal Basic Education Opportunity Grant (BEOG) pursuant to 20 U.S.C. § 1070a. He was awarded $1400 for the 1975–76 school year. In addition, he received an athletic scholarship from the University of Kansas in the amount of $2621. In the spring of 1976, plaintiff was declared ineligible to compete in intercollegiate athletic events because his athletic award plus his BEOG exceeded National Collegiate Athletic Association (NCAA) limitations.[1] The University of

---

1. The NCAA Constitution, art. 3, § 1(f)(1), provided at the time the dispute arose:

> In the event [financial aid awarded by an institution] exceeds commonly accepted educational expenses (i. e., tuition and fees; room and board; required courses related supplies and books, and incidental expenses not in excess of fifteen dollars per month)

during the undergraduate career of the recipient, it shall be considered "pay" for participation in intercollegiate athletics.

Section 4(b) further stated:

> Where a student's athletic ability is taken into consideration in any degree in awarding him unearned financial aid, . . . such aid combined with that received from the follow-

Kansas unsuccessfully appealed to the NCAA to restore plaintiff's eligibility but did not pursue its right to appeal further.

Wiley then brought suit in the United States District Court for the District of Kansas to enjoin, *inter alia*, the inclusion of his BEOG in the calculation of the maximum financial assistance permissible under the NCAA Constitution. He alleged violation of the Equal Protection Clause and the Supremacy Clause. The court issued the requested injunction. It found that the NCAA rule in question was unconstitutional under the Equal Protection Clause because it bore no rational relationship to the purposes and policies of the NCAA.[2] The court declined, however, to apply a Supremacy Clause analysis to provisions of the NCAA rules. The NCAA and the Big Eight Conference[3] appeal from the judgment based on the Equal Protection Clause issue, and Wiley cross-appeals on the Supremacy Clause issue.

Following the initiation of this appeal, Wiley graduated from the University of Kansas. Under the protection of the district court's injunction, he had participated on the University of Kansas track team until his graduation. He received his full athletic scholarship along with his BEOG during this time.

## MOOTNESS

▉ Mootness, like ripeness and standing, has its constitutional origin in the "case or controversy" limitation of Article III which insures that courts exercise their power only in cases where true adversary context allows informed judicial resolution. *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964); *Napier v. Gertrude*, 542 F.2d 825, 828 (10th Cir. 1976), *cert. denied*, 429 U.S. 1049, 97 S.Ct. 759, 50 L.Ed. 765 (1977). The actual controversy between the parties "must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated." *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973).

▉ The portion of the district court's opinion granting prospective relief in the form of an injunction has indeed been mooted by Wiley's graduation. It is our opinion, however, that a substantial controversy still exists between the parties.

Section 10 of the Official Procedure Governing the NCAA Enforcement Program contemplates possible retrospective action against a student-athlete who is ineligible under the terms of the NCAA Constitution, Bylaws or other legislation of the Association but who is permitted to participate in intercollegiate competition under the protection of a court restraining order or in-

---

ing and similar sources may not exceed ["commonly accepted educational expenses"].

The "sources" of financial aid that must be combined with an institutional athletic grant included:

Governmental grants for educational purposes, except (i) benefits received by student-athletes under the G.I. Bill of Rights; (ii) payments to student-athletes for participation in military reserve training programs [e. g., ROTC]; or (iii) payments by the U.S. Government under the terms of the War Orphans' Educational Program, Social Security Insurance Program or Non-Service-Connected Veteran's Death Pension Program.

*Id.* § 4(b)(2).

"Commonly accepted educational expenses" at the University of Kansas were $2756. Since it was a non-excluded government grant, plaintiff's $1400 BEOG was "combined" with his athletic scholarship of $2621. Under § 1(f)(1), the $1265 excess was "considered 'pay' for participation in intercollegiate athletics," and plaintiff was declared ineligible for participation under § 1(a)(1).

2. The issue was not rational purpose, but rather one of over or under inclusive categories. The trial court concluded that the inclusion of BEOG grants not subject to university manipulation in the calculation of eligibility was not rationally related to the objective of preventing professionalism. The court was also impressed by the fact that other categories of government aid, similar to BEOG's, were excluded from consideration. It rejected the argument that, because these forms of excluded aid must be "earned" by the recipient or his parent, BEOG's should be distinguished on that ground.

3. The Big Eight Conference is an athletic association composed of eight universities, including the University of Kansas, which operates under the purview of NCAA rules.

junction operative against the institution of the NCAA. Record, vol. 2, at 122–23. Under this provision the NCAA can in its discretion vacate or strike the individual records and performances of the student-athlete, forfeit victories won by the team upon which the student-athlete played, and require the return of awards.[4] For example, the Big Eight Conference, also a defendant in this action, has given notice of its intention to adjust Wiley's points and vacate any places earned in Big Eight championships should this court find him to have been ineligible to participate. Brief for Appellee on Mootness, Exhibit A at 1. As long as Wiley's records and awards are at stake, this court can render a decision that will affect the rights of the litigants. See Uyeda v. Brooks, 348 F.2d 633 (6th Cir. 1965).

DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1706, 40 L.Ed.2d 164 (1974), does not require a different result on these facts. The University of Washington Law School, a defendant in DeFunis' admission policies challenge, warranted to the Supreme Court that DeFunis would be allowed to finish his final quarter of law school and receive his diploma regardless of the resolution of his case by the Court. Id. at 316, 94 S.Ct. 1706. Consequently, DeFunis was assured of obtaining the entire and ultimate object of his suit without threat of retroactive penalty.

■ Neither is Wiley's appeal rendered moot by the subsequent amendment of the NCAA Constitution to take into account the nature of the BEOG program and the exceptional circumstances of BEOG recipients.[5] "[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e., does not make the case moot." DeFunis v. Odegaard, 416 U.S. at 318, 94 S.Ct. at 1706, quoting United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). This is particularly true when, as here, the amendment does not fully comport with the relief sought by the plaintiff. See Wirtz v. Local 153, Glass Bottle Blowers Association, 389 U.S. 463, 474–75, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968).

## SUBSTANTIAL FEDERAL QUESTION

■ Finding this case not moot does not take us to the merits. We must first determine whether the interest Wiley is seeking to preserve is sufficiently substantial to invoke the cognizance of a federal court. We observe that the case does not implicate the right to a college education, or even to participate in intercollegiate athletics. Wiley's interest is instead the right to attend college and play sports under a certain favorable financing arrangement—i. e., a full athletic scholarship plus a full BEOG grant.[6]

Federal district courts are granted original jurisdiction under 28 U.S.C. § 1343(3) to hear civil actions commenced "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the Unit-

---

4. Other sanctions are authorized by section 10 but are inapplicable here, their impact falling mainly upon the institution which allows an ineligible student-athlete to participate in competition.

5. Article 3, § 4(b)(2) now exempts BEOG awards from the computation of the maximum allowable financial aid "provided that maximum when added to the BEOG award does not exceed the U.S. Office of Education-approved 'cost of education' at the member institution." Reply Brief for Appellant at 23.

6. Wiley admits to several available options that would have permitted attending college. Wiley insists that "[a]s a student with complete need at the university, [he would be] entitled to $3800 aid" from various programs. Brief for Appellee at 48. Indeed, Wiley could have remained on the university's track team and under NCAA rules met his residual needs through federal educational loans or other student loans. See Brief for Appellee at 51. Wiley was also free under NCAA rules to obtain employment during periods either before or between his years in college. Finally, while it may have required an "austere" life style, Brief for Appellee at 48, Wiley could have survived in college on his athletic scholarship alone. The athletic scholarship available to Wiley in 1975–76 included tuition, books, housing, food and, had Wiley chosen to do various jobs for the athletic department, $15.00 per month extra. Record, vol. 1, at 60; Brief for Appellee at 5.

ed States or by any Act of Congress providing for equal rights." However, this grant of jurisdiction is tempered by a judicial doctrine which originated with an 1875 enactment requiring the dismissal of any claim which did not "really and substantially involve a dispute or controversy properly within the jurisdiction of [the district] court." Act of March 3, 1875, ch. 137, § 5, 18 Stat. 472 (1875).

Recently, in *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), the Supreme Court traced the history and scope of the substantial federal question doctrine:

> Over the years this Court has repeatedly held that the federal courts are without power to entertain claims otherwise within their jurisdiction if they are "so attenuated and unsubstantial as to be absolutely devoid of merit," *Newburyport Water Co. v. Newburyport,* 193 U.S. 561, 579 [24 S.Ct. 553, 557, 48 L.Ed. 795] (1904); "wholly insubstantial," *Bailey v. Patterson,* 369 U.S. 31, 33 [82 S.Ct. 549, 550–551, 7 L.Ed.2d 512] (1962); "obviously frivolous," *Hannis Distilling Co. v. Baltimore,* 216 U.S. 285, 288 [30 S.Ct. 326, 327, 54 L.Ed. 482] (1910); "plainly unsubstantial," *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 105 [53 S.Ct. 549, 550, 77 L.Ed. 1062] (1933); or "no longer open to discussion," *McGilvra v. Ross,* 215 U.S. 70, 80 [30 S.Ct. 27, 31, 54 L.Ed. 95] (1909).

415 U.S. at 536–37, 94 S.Ct. at 1378–1379. According to *Hagans,* the doctrine will warrant dismissal when the claim is (1) wholly insubstantial or obviously frivolous, (2) foreclosed by prior cases which have settled the issue one way or another, or (3) so patently without merit as to require no meaningful consideration. *Id.* at 539–41, 94 S.Ct. 1372; *see also Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 70–71, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

This court has consistently found that, unless clearly defined constitutional principles are at issue, the suits of student-athletes displeased with high school athletic association or NCAA rules do not present substantial federal questions. *See Colorado Seminary v. NCAA,* 570 F.2d 320 (10th Cir. 1978); *Albach v. Odle,* 531 F.2d 983 (10th Cir. 1976); *Oklahoma High School Athletic Association v. Bray,* 321 F.2d 269 (10th Cir. 1963). In light of *Hagans,* language contained in these cases may be too sweeping if applied where access to an education or other similarly substantial interest is at stake. Nonetheless, we find neither Wiley's personal interest nor the character of the alleged misclassification, even under *Hagans,* to require alteration of our cases.

Accordingly, the case is dismissed.

HOLLOWAY, Circuit Judge, dissenting:

I respectfully dissent.

While I agree with the majority opinion that this controversy is not moot, I am unable to concur in the conclusion on the jurisdictional issue. The majority holds that Wiley's interest in participating in college athletics is not sufficiently substantial to invoke the federal court's jurisdiction to hear his equal protection challenge to the NCAA regulations. I now feel, on the contrary, that such an interest is cognizable as the premise for the assertion of such an equal protection claim. Therefore, I would overrule our prior decisions which are to the contrary,[1] and would hold that federal jurisdiction exists under 28 U.S.C. § 1343(3) in this case. *See Howard University v. NCAA,* 166 U.S.App.D.C. 260, 510 F.2d 213, 217–20 (D.C. Cir.); *Brenden v. Independent School District,* 477 F.2d 1292, 1299 (8th Cir.). *See also Shelton v. NCAA,* 539 F.2d 1197, 1198 (9th Cir.); *Parish v. NCAA,* 506 F.2d 1028, 1033 (5th Cir.). *But see Associated Students, Inc. v. NCAA,* 493 F.2d 1251, 1255 (9th Cir.); *Mitchell v. Louisiana High School Athletic Ass'n,* 430 F.2d 1155, 1157 (5th Cir.). The importance of participation

---

1. Our prior decisions which reject such federal claims are *Colorado Seminary v. NCAA,* 570 F.2d 320 (10th Cir.); *Albach v. Odle,* 531 F.2d 983 (10th Cir.); *Oklahoma High School Athletic Association v. Bray,* 321 F.2d 269 (10th Cir.).

in athletic activities is not sufficiently different from participation in academic or other competitive activities, *see Baltic Independent School District v. South Dakota High School Activities Ass'n*, 362 F.Supp. 780, 783 (D.S.D.), to justify the dismissal of plaintiff's claim here.

Reaching the merits of the constitutional claims, I am convinced that the trial court's holding on the equal protection claim was sound. Consequently, I would affirm on the basis of the trial court's opinion as to that claim, without however expressing any views as to the claim under the Supremacy Clause.

LOGAN, Circuit Judge, dissenting:

The majority opinion finds there is no substantial federal question presented by this case. I disagree. The Supreme Court, in *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), declared a rigorous standard that must be met before the federal question is determined to be insubstantial.

> " 'Constitutional insubstantiality' for this purpose has been equated with such concepts as 'essentially fictitious,' *Bailey v. Patterson*, 369 U.S. [31], at 33 [82 S.Ct. [549], at 551, 7 L.Ed.2d 512], 'wholly insubstantial,' *ibid.*; 'obviously frivolous,' *Hannis Distilling Co. v. Baltimore*, 216 U.S. 285, 288 [30 S.Ct. [326], 327, 54 L.Ed. 482] (1910); and 'obviously without merit,' *Ex parte Poresky*, 290 U.S. 30, 32 [54 S.Ct. [3], 4–5, 78 L.Ed. 152] (1933). The limiting words 'wholly' and 'obviously' have cogent legal significance. In the context of the effect of prior decisions upon the substantiality of constitutional claims, those words import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial for the purposes of 28 U.S.C. § 2281. A claim is insubstantial only if ' "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." ' "

*Id.* at 537–38, 94 S.Ct. at 1379 (quoting *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973)). Application of the *Hagans* standard to Wiley's claims leads me to conclude that at least the equal protection argument raises a substantial federal question, which properly considered is neither frivolous nor foreclosed by prior decisions.[1]

Everyone concerned admits that neither a suspect classification nor deprivation of a fundamental constitutional right is involved in this case. But even so, Wiley is a person entitled to "equal protection" against state action under a rule not rationally related to a legitimate purpose of the acting agency.

The Supreme Court has recently stated the equal protection inquiry, as it would be applicable here, as follows:

> Since respondent neither asserted nor established the existence of any suspect classification or the deprivation of any fundamental constitutional right, see *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. [1278], 1300, [36 L.Ed.2d 16] (1973), the only in-

---

1. I would not regard the Supremacy Clause argument insubstantial or frivolous, but I would find it nonmeritorious. It is asserted that the federal Basic Economic Opportunity Grant (BEOG) and other federal assistance legislation is being frustrated by the operation of the NCAA athletic scholarship rules, as administered through the various state universities, in violation of the Supremacy Clause. The BEOG legislation, 20 U.S.C. § 1070a, is intended to provide a minimum base of financial support for impoverished students who wish to attend college. The only other financial sup-

port taken into account in making a BEOG are the resources the applicant's family can be expected to provide. These grants are not reduced by the amounts of scholarship or other aid made available to the student. I do not believe Congress' intent is frustrated if a university gives less scholarship aid to a student because he or she has a BEOG, nor do I see any frustration of congressional purposes by enforcing an NCAA requirement that an athletic scholarship be limited or denied to a student who has a BEOG.

quiry is whether the State's classification is "rationally related to the State's objective." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 315, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). *Harrah Indep. School Dist. v. Martin*, 440 U.S. 194, 199, 99 S.Ct. 1062, 1065, 59 L.Ed.2d 248 (1979). Other circuits have used similar wording in reviewing NCAA rules in an equal protection context. "None of the parties contend that the NCAA rule infringes upon a fundamental right which would necessitate strict judicial scrutiny. Instead, we must examine the rule to determine whether it rationally furthers some legitimate purpose." *Shelton v. NCAA*, 539 F.2d 1197, 1198 (9th Cir. 1976). *See also Moreland v. Western Penn. Interscholastic Athletic League*, 572 F.2d 121, 124 (3d Cir. 1978); *Associated Students, Inc. v. NCAA*, 493 F.2d 1251, 1255 (9th Cir. 1974); *Mitchell v. Louisiana High School Athletic Ass'n*, 430 F.2d 1155, 1158 (5th Cir. 1970). *Cf. Lansdale v. Tyler Junior College*, 470 F.2d 659, 662 (5th Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2268, 36 L.Ed.2d 964 (1973) (hair code). If our previous cases, relied upon in the majority opinion, stated a different standard of review they painted with too broad a brush.

I agree that the constitutional analysis requires broad discretion be given to the NCAA eligibility rules. *See McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). But even applying a minimal test of rationality the NCAA's rule on BEOG's fails; Wiley's argument raised here is not only substantial, it is compelling.

There is state action in the application of NCAA rules; their enforcement by state university members is so intertwined with the state-controlled educational process that judicial evaluation of the conduct is warranted. *Shelton v. NCAA*, 539 F.2d 1197 (9th Cir. 1976); *Howard Univ. v. NCAA*, 510 F.2d 213 (D.C. Cir. 1975); *Parish v. NCAA*, 506 F.2d 1028 (5th Cir. 1975); *Associated Students, Inc. v. NCAA*, 493 F.2d 1251 (9th Cir. 1974).

Under the NCAA rule a student-athlete may receive a full grant even though his or her parents are millionaires and are providing any level of support. Student-athletes also can receive without penalty government payments under the GI Bill of Rights, military reserve training programs, the War Orphans Educational Program, Social Security Insurance Program and Non-Service-Connected Veteran's Death Pension Program. Thus, the rule distinguishes between student-athletes receiving money from BEOG's and those receiving money from their parents or these government sources.

The NCAA regulations concerning limitations on aid to athletes, as applicable here, clearly have as their principal purpose the promotion of amateurism in athletics by prohibiting pay for play. The NCAA concludes, and I think permissibly, that any aid which can be manipulated by the university or its supporters to supplement the basic athletic grant-in-aid to student-athletes falls into the play-for-pay category. The regulations also seem to prevent one member institution from using its access to economic resources (through endowment funds, alumni or otherwise) to obtain an advantage over other member institutions in the fielding of athletic teams. These are legitimate purposes, I believe. The question then is whether the regulation applied here is rationally related to these purposes.

Appellants argue that the exclusion of the assistance received from parents, from the GI Bill of Rights, or from social security, veterans or other death benefits is justified as "earned" by the athlete or the athlete's family prior to matriculation. That does not explain, of course, the exclusion of payments for student-athletes' participation in military reserve training programs. What is foreclosed or taken into account in determining the amount of assistance permitted is payment for employment of the student during the semester or term time, and all grants and scholarships (government or otherwise) that possibly can be controlled by the university or its athletic supporters. Thus, the line drawn is to permit support that is totally beyond the control of the university and its supporters, that has no possible relationship to the student's athletic ability or participation, that does not provide an advantage to one university over

another, and that can have no bearing upon the principal aim of the regulations—prohibiting pay for play.

The key question then becomes whether the university or its supporters can manipulate the BEOG's, and, perhaps, whether these grants are more available to students in some member universities than in others. The BEOG legislation provides a minimum base of financial support for economically deprived college students. BEOG's are based solely on need, considering only the resources the student's family can be expected to provide. Athletic ability or participation is totally irrelevant to the grants; neither is scholastic nor other ability a factor. The program operates under an entitlement concept that all eligible students receive awards without regard to any other student financial aid. The student apparently may attend any college or university. It has been described as a "G.I. Bill for all Americans." 117 Cong.Rec. 30495 (1971). All this appears to be admitted by the NCAA and the other appellants, who have appended to their reply brief a letter setting out much of that policy, written by the Chief of the Program Policy and Analysis Branch of the Department of Health, Education & Welfare.

A university can enter into an agreement with the United States Commissioner of Education to administer the BEOG's, and to calculate and disburse funds to qualifying students enrolled in that institution. 45 C.F.R. §§ 190, *et seq.* But disbursement must be in accordance with very strict requirements of federal regulations; these requirements eliminate the exercise of any significant discretion. Under statutory and regulatory BEOG guidelines the university cannot administer the grants in a manner calculated to benefit student-athletes without violating federal law.

There was absolutely no indication that the University of Kansas could manipulate the BEOG program to provide any semblance of pay for play. Applications need not be made through any university; Wiley applied for his grant through a public library in Maryland. Neither is there any indication that the University of Kansas, nor any other university member of the NCAA, could derive a special benefit from the BEOG's that would help the institution secure an advantage over any similar institution in the recruitment of or assistance to student-athletes. The NCAA appears to have recognized these conclusions because it has now changed its regulations to permit student-athletes to receive BEOG grants along with athletic scholarships.[2]

Wiley is not entitled to a university education as a fundamental right, and certainly not to participation in college athletics, but as a member of an identifiable class he is protected under the Equal Protection Clause from arbitrary state action. Although the test to be applied in this instance is the "rational relationship" test, requiring great deference to the formulators, this appears to be one of those perhaps rare cases in which there is no rational basis for the NCAA's rule. I would affirm the district court decision.

2. Under the 1977 amendment to the NCAA rules, the amount available under a BEOG, when added to the athletic scholarship, may not exceed an allowable maximum. Apparently the amount of the athletic scholarship must be reduced in such event. *See* Appellant's Reply Brief, Appendix A. I express no opinion upon whether the new rule bears a rational relationship to the legitimate purposes of the NCAA regulation.