**Anita DeFRANTZ et al., Plaintiffs,**

v.

**UNITED STATES OLYMPIC COMMITTEE, Defendant.**

Civ. A. No. 80–1013.

United States District Court,
District of Columbia.

May 16, 1980.

William H. Allen, Edward R. Mackiewicz, Covington & Burling, Washington, D.C., for plaintiffs.

Patrick H. Sullivan, James S. Morris, Michael S. Press, Whitman & Ransom, Washington, D.C., for defendant.

JOHN H. PRATT, District Judge.

## MEMORANDUM OPINION

Plaintiffs, 25 athletes and one member of the Executive Board of defendant United States Olympic Committee (USOC), have moved for an injunction barring defendant USOC from carrying out a resolution, adopted by the USOC House of Delegates on April 12, 1980, not to send an American team to participate in the Games of the XXIInd Olympiad to be held in Moscow in the summer of 1980. Plaintiffs allege that in preventing American athletes from competing in the Summer Olympics, defendant has exceeded its statutory powers and has abridged plaintiffs' constitutional rights.

For the reasons discussed below, we find that plaintiffs have failed to state a claim

upon which relief can be granted. Accordingly, we deny plaintiffs' claim for injunctive and declaratory relief and dismiss the action.

*THE FACTS*

In essence, the action before us involves a dispute between athletes who wish to compete in the Olympic Games to be held in Moscow this summer,[1] and the United States Olympic Committee, which has denied them that opportunity in the wake of the invasion and continued occupation of Afghanistan by Soviet military forces. Because this dispute confronts us with questions concerning the statutory authority of the USOC, its place and appropriate role in the international Olympic movement, and its relationship to the United States Government and with certain United States officials, we begin with a brief discussion of the organizational structure of the Olympic Games and the facts which have brought this action before us. These facts are not in dispute.

According to its Rules and By-laws, the International Olympic Committee (IOC) governs the Olympic movement and owns the rights of the Olympic games.[2] IOC Rules provide that National Olympic Committees (NOC) may be established "as the sole authorities responsible for the representation of the respective countries at the Olympic Games,"[3] so long as the NOC's rules and regulations are approved by the IOC.[4] The USOC is one such National Olympic Committee.

The USOC is a corporation created and granted a federal charter by Congress in 1950. Pub.L. No. 81–805, 64 Stat. 899. This charter was revised by the Amateur Sports Act of 1978, Pub.L. No. 95–606, 92 Stat. 3045, 36 U.S.C. §§ 371 *et seq.* Under this statute, defendant USOC has "exclusive jurisdiction" and authority over participation and representation of the United States in the Olympic Games.

The routine procedure initiating the participation of a national team in Olympic competition is the acceptance by the NOC of an invitation from the Olympic Organizing Committee for the particular games.[5] In accordance with this routine procedure under IOC Rules, the Moscow Olympic Organizing Committee extended an invitation to the USOC to participate in the summer games. Recent international and domestic events, however, have made acceptance of this invitation, which must come on or before May 24, 1980, anything but routine.

On December 27, 1979, the Soviet Union launched an invasion of its neighbor, Afghanistan. That country's ruler was deposed and killed and a new government was installed. Fighting has been at times intense, casualties have been high, and hundreds of thousands of Afghan citizens have fled their homeland. At present, an estimated 100,000 Soviet troops remain in Afghanistan, and fighting continues.

President Carter termed the invasion a threat to the security of the Persian Gulf area as well as a threat to world peace and stability and he moved to take direct sanctions against the Soviet Union. These sanctions included a curtailment of agricultural and high technology exports to the Soviet Union, and restrictions on commerce with the Soviets. The Administration also turned its attention to a boycott of the summer Olympic Games as a further sanction against the Soviet Union.

---

**1.** Of the 25 athletes who are named plaintiffs in this action, the record now before us indicates that only one has been selected as a member of the 1980 United States Olympic Team. The complaint alleges that most of the other named plaintiffs stand an "excellent chance" of selection as the result of competitive athletic trials being held this Spring. Plaintiffs have moved for certification as a class action pursuant to Rule 23(b)(2), Fed.R.Civ.P. Included in this intended class are athletes who have already been selected for the 1980 United States Olympic Team.

**2.** International Olympic Committee Olympic Charter, Rule 4.

**3.** *Id.*, Rule 24B.

**4.** *Id.*, By-laws Ch. 5(a).

**5.** *Id.*, Rule 61.

As the affidavit of then Acting Secretary of State Warren Christopher makes clear, the Administration was concerned that "[t]he presence of American competitors would be taken by the Soviets as evidence that their invasion had faded from memory or was not a matter of great consequence or concern to this nation." Affidavit of Acting Secretary of State Warren Christopher, at 3. The Administration's concern was sharpened because "[t]he Soviet Union has made clear that it intends the Games to serve important national political ends. For the U.S.S.R., international sports competition is an instrument of government policy and a means to advance foreign policy goals." *Id.*

With these concerns in mind, the Administration strenuously urged a boycott of the Moscow games. On January 20, 1980, President Carter wrote the President of the United States Olympic Committee to urge that the USOC propose to the IOC that the 1980 summer games be transferred from Moscow, postponed, or cancelled if the Soviet forces were not withdrawn within a month. On January 23, 1980 the President delivered his State of the Union Message, in which he said that he would not support sending American athletes to Moscow while Soviet military forces remained in Afghanistan.

Following these statements, the United States House of Representatives passed, by a vote of 386 to 12, a Concurrent Resolution opposing participation by United States athletes in the Moscow Games unless Soviet troops were withdrawn from Afghanistan by February 20th. The Senate passed a similar resolution by a vote of 88 to 4.

As this was unfolding, the USOC's 86 member Executive Board held a meeting in Colorado Springs on January 26, 1980, inviting White House counsel Lloyd Cutler to address them "because no officer or any member of the Board was knowledgeable about the far-reaching implications of the Soviet invasion." Affidavit of Robert J. Kane, at 3. According to USOC President Kane, in early January some USOC officers became concerned that sending American athletes to Moscow could expose them to danger if hostility erupted at the games, and that acceptance of the invitation could be seen as tacit approval of or at least acceptance of the Soviet invasion. Mr. Cutler also met with USOC officers at least twice in February to discuss the matter further. On each occasion, according to the Kane affidavit, Mr. Cutler urged Mr. Kane to convene an emergency meeting of the USOC Executive Board to act on the Moscow problem. However, legal counsel for the USOC advised Mr. Kane that only the House of Delegates and not the USOC Executive Board could decide whether or not to send a team to Moscow.

On March 21, 1980, President Carter told members of the Athletes Advisory Council, an official body of the USOC, that American athletes will not participate in the Moscow summer games. On April 8, 1980, the President sent a telegram to the president and officers of the USOC and to its House of Delegates, urging the USOC vote against sending an American team to Moscow. In an April 10th speech, the President said that "if legal actions are necessary to enforce [my] decision not to send a team to Moscow, then I will take those legal actions." Among the legal measures the President apparently contemplated was invoking the sanctions of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* On April 10 and 11, 1980, the 13 member Administrative Committee of the USOC met in Colorado Springs and voted to support a resolution against sending a team to Moscow. Only Anita DeFrantz, a plaintiff in this action, dissented.

At the President's request and over initial objections by the USOC, Vice President Mondale addressed the assembled House of Delegates prior to their vote on April 12, 1980. The Vice President strongly and vigorously urged the House of Delegates to support a resolution rejecting American participation in the summer games in Moscow.

After what USOC President Kane describes in his affidavit as "full, open, complete and orderly debate by advocates of

each motion," the House of Delegates, on a secret ballot, passed by a vote of 1,604 to 798, a resolution which provided in pertinent part:

RESOLVED that since the President of the United States has advised the United States Olympic Committee that in light of international events the national security of the country is threatened, the USOC has decided not send a team to the 1980 Summer Games in Moscow . . .

FURTHER RESOLVED, that if the President of the United States advises the United States Olympic Committee, on or before May 20, 1980, that international events have become compatible with the national interest and the national security is no longer threatened, the USOC will enter its athletes in the 1980 Summer Games.

Plaintiffs describe these attempts by the Administration to persuade the USOC to vote not to send an American team to Moscow as "a campaign to coerce defendant USOC into compliance with the President's demand for a boycott of the Olympic Games." Amended Complaint for Declaratory and Injunctive Relief, ¶ 10. In addition, plaintiffs' complaint alleges that the President and other Executive Branch officials threatened to terminate federal funding of the USOC and that they raised the possibility of revoking the federal income tax exemption [6] of the USOC if the USOC did not support the President's decision to boycott the 1980 Games.[7] The complaint also alleges that these officials state that the Federal government would provide increased funding to the USOC if the USOC supported a boycott.

Plaintiffs state three causes of action in their complaint. The first, a statutory claim, is that defendant violated the Amateur Sports Act of 1978, *supra*, in the following respects:

a. Defendant exercised a power it does not have—to decide that no United States amateur athletes shall participate in the 1980 Games.

b. Defendant breached a duty to organize, finance and control participation in the events and competitions of the Olympic Games by United States athletes.

c. Defendant denied to United States amateur athletes the opportunity to compete in these Games on a basis other than their want of athletic merit, or for a sports related reason.

d. Defendant yielded its exclusive jurisdiction over Olympic matters to the political leaders of the nation.

e. Defendant acted in a political manner.

f. Defendant yielded its autonomy and has succumbed to political and economic pressure.

Plaintiffs' second cause of action, a constitutional claim, alleges that defendant's action constituted "governmental action" which abridged plaintiffs' rights of liberty, self-expression, personal autonomy and privacy guaranteed by the First, Fifth and Ninth Amendments to the United States Constitution.

Plaintiffs' third cause of action is that the USOC has violated its Constitution, By-laws and governing statute, injuring the USOC and violating the rights of plaintiff Shaw, a member of the USOC's Executive Board, and that defendant is subject to an action to compel compliance with its Constitution, By-laws and governing statute.

---

**6.** Plaintiffs have submitted as Exhibit G an April 9, 1980 *Washington Post* article which reports that a White House official acknowledged that lifting the USOC's tax exempt status had been discussed by Administration officials with members of Congress but that the idea was not being proposed at that time.

**7.** Plaintiffs have submitted as Exhibit E an April 10, 1980 *New York Times* article which reports that a USOC official said 16 corpora-

tions were delinquent in pledges to the USOC and that one corporation, Sears, Roebuck & Company, acknowledged it was withholding a contribution because of delays by the USOC on the boycott issue. The article also reported that a Sears official said the action was taken after "the chairman had talked with Anne Wexler, an assistant to President Carter." The report adds that Miss Wexler denied that any pressure had been put on Sears.

Plaintiffs allege that unredressed, these violations will result in great and irreparable injury to the athletes. "Many would lose a once-in-a-lifetime opportunity to participate in the Olympic Games, and the honor and prestige that such participation affords. Most of the class members are at or near their physical peaks at the present time and will not physically be capable of reaching the same or higher levels at a later period of their lives." Amended Complaint for Declaratory and Injunctive Relief, ¶ 19.

In summary, plaintiffs ask this court to declare the April 12, 1980 resolution of the USOC House of Delegates null and void because it violated statutory authority and constitutional provisions and to permanently enjoin the USOC from carrying out that resolution.

Defendant and the Government have moved to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. and argue for dismissal of this action on several grounds. They contend that the Amateur Sports Act of 1978 has not been violated by ·defendant, that the Act does not deny the USOC the authority to decide not to send an American team to the Moscow Games, that the Act does not grant plaintiffs a right to compete in the Olympics if the USOC decides not to enter a team, and that plaintiffs lack a cause of action under the Act to maintain this lawsuit. As for the constitutional claims, they argue that the decision of the USOC was not "state action" and therefore, that plaintiffs have no cognizable constitutional claims. They further argue that even if the action of the USOC could be considered "state action," no rights guaranteed to plaintiffs under the Constitution were abridged.

Because of the time constraints involved in this action, this court granted plaintiffs' motion that a trial of the action on the merits be advanced and consolidated with the hearing of the application for a preliminary and permanent injunction.

Oral argument was heard by this court on May 13, 1980. At that time, the court granted the motion of the United States to appear as *Amicus Curiae* and the court denied the motion of the Washington Legal Foundation to appear as *Amicus Curiae.*[8]

## ANALYSIS

This action presents us with several issues for decision, falling into two distinct categories; one is statutory and the other is constitutional. We turn first to the statutory issues.[9]

### 1. *The Amateur Sports Act of 1978*

Plaintiffs allege in their complaint that by its decision not to send an American team to compete in the summer Olympic Games in Moscow, defendant USOC has violated the Amateur Sports Act of 1978, *supra*, (The Act) in at least *six* respects, which we have listed above. We deal with two of the alleged violations here. Reduced to their essentials, these allegations are that the Act does not give, and that Congress intended to deny, the USOC the authority to decide not to enter an American team in the Olympics, except perhaps for sports-related reasons, and that the Act guarantees to certain athletes[10] a right to compete in the Olympic Games which defendant denied them. We consider each allegation in turn.[11]

---

**8.** Defendant consented to the Washington Legal Foundation filing an amicus brief but plaintiffs refused to consent.

**9.** In response to questioning from the court at oral argument, counsel for plaintiffs indicated that class action certification in this case is not necessary to insure that appropriate relief would be granted to the envisioned class by any order this court may issue. If we were to rule in favor of the named plaintiffs, the class of athletes envisioned by plaintiffs would receive full benefit of that ruling. Accordingly, we deny plaintiffs' motion for certification as a class pursuant to Rule 23(b)(2), Fed.R.Civ.P.

**10.** By virtue of their athletic abilities.

**11.** Plaintiffs raise four other violations of the Act in their complaint: defendant yielded its autonomy and has succumbed to political and economic pressure; defendant acted in a political manner; defendant yielded its exclusive jurisdiction over Olympic matters to the political leaders of the nation; and defendant breached a duty to organize, finance, and control participation in the events and competitions of the

### (a) *The USOC's Authority Not to Send a Team to Moscow*

The United States Olympic Committee was first incorporated and granted a federal charter in 1950. Pub.L. No. 81–805, *supra*. However, predecessors to the now federally-chartered USOC have existed since 1896, and since that time, they have exercised the authority granted by the International Olympic Committee to represent the United States as its National Olympic Committee in matters pertaining to participation in Olympic games. It is unquestioned by plaintiffs that under the International Olympic Committees Rules and By-laws, the National Olympic Committees have the right to determine their nation's participation in the Olympics. IOC Rule 24B provides that "NOC's shall be the sole authorities responsible for the *representation* of the respective countries at the Olympic Games . . ." and Chapter 5, paragraph 7 of the By-laws to Rule 24 provides that "[r]epresentation covers the decision to *participate* . . .." (emphasis supplied). Nothing in the IOC Charter, Rules or By-laws requires a NOC, such as the USOC, to accept an invitation to participate in any particular Olympic contest and the President of the IOC has said that participation in the Olympic games is entirely voluntary. As defendant has argued, an invitation to participate is just that, an invitation which may be accepted or declined.

Because defendant USOC clearly has the power under IOC Rules to decide not to enter an American team in Olympic competition, the question then becomes whether the Amateur Sports Act of 1978, which rewrote the USOC's charter, denies the USOC that power. Plaintiffs emphatically argue that it does, and defendant and the Government just as emphatically argue that it does not.

Plaintiffs' argument is simple and straightforward: The Act by its terms does not expressly confer on the USOC the power to decline to participate in the Olympic Games, and if any such power can be inferred from the statute, the power must be exercised for sports-related reasons. Defendant and the Government respond that the Act gives the USOC broad powers, including the authority to decide not to accept an invitation to send an American team to the Olympics.

The principal substantive powers of the USOC are found in § 375(a) of the Act.[12] In determining whether the USOC's authority under the Act encompasses the right to decide not to participate in an Olympic contest, we must read these provisions in the context in which they were written. In writing this legislation, Congress did not create a new relationship between the USOC and the IOC. Rather, it recognized an already long-existing relationship between the two and statutorily legitimized that relationship with a federal charter and federal incorporation.[13] The legislative his-

---

Olympic Games by United States athletes. The first three refer to the exercise of "political pressure" on the USOC by the Administration and the USOC's response to the political pressure. At oral argument, counsel for plaintiffs conceded that the significant statutory questions could be decided without reference to whether the Administration exerted political pressure on defendant. We agree with plaintiffs and for this reason, we do not consider these three alleged violations against the plaintiffs. As for the last alleged violation, we deal with this issue below.

12. They are to: "(1) serve as the coordinating body for amateur athletic activity in the United States directly relating to international amateur athletic competition; (2) represent the United States as its national Olympic committee in relations with the International Olympic Com-

mittee . . .; (3) organize, finance, and control the representation of the United States in the competitions and events of the Olympic Games . . . and obtain, either directly or by delegation to the appropriation national governing body, amateur representation for summer games." 36 U.S.C. § 375(a)(1), (2), (3). The "objects and purposes" section of the Act includes the provision, also found in the 1950 Act, that the USOC shall "exercise exclusive jurisdiction . . . over all matters pertaining to the participation of the United States in the Olympic Games . . . including the representation of the United States in such games . . .." *Id.*, § 374(3).

13. To the extent the USOC was granted extended power by the 1978 Act, the legislative history makes clear, and the plaintiffs do not dis-

tory demonstrates Congressional awareness that the USOC and its predecessors, as the National Olympic Committee for the United States, have had a continuing relationship with the IOC since 1896.[14] Congress was necessarily aware that a National Olympic Committee is a creation and a creature of the International Olympic Committee, to whose rules and regulations it must conform. The NOC gets its power and its authority from the IOC, the sole proprietor and owner of the Olympic Games.

In view of Congress' obvious awareness of these facts, we would expect that if Congress intended to limit or deny to the USOC powers it already enjoyed as a National Olympic Committee, such limitation or denial would be clear and explicit. No such language appears in the statute. Indeed, far from precluding this authority, the language of the statute appears to embrace it. For example, the "objects and purposes" section of the Act speaks in broad terms, stating that the USOC shall exercise "exclusive jurisdiction" over ". . . *all matters* pertaining to the participation of the United States in the Olympic Games . . . ." (emphasis supplied). We read this broadly stated purpose in conjunction with the specific power conferred on the USOC by the Act to "represent the United States as its national Olympic committee in relations with the International Olympic Committee," and in conjunction with the IOC Rules and By-laws, which provide that "representation" includes the decision to participate. In doing so, we find a compatibility and not a conflict between the Act and the IOC Rules on the issue of the authority of the USOC to decide whether or not to accept an invitation to field an

American team at the Olympics. The language of the statute is broad enough to confer this authority, and we find that Congress must have intended that the USOC exercise that authority in this area, which it already enjoyed because of its long-standing relationship with the IOC. We accordingly conclude that the USOC has the authority to decide not to send an American team to the Olympics.

Plaintiffs next argue that if the USOC does have the authority to decide not to accept an invitation to send an American team to the Moscow Olympics, that decision must be based on "sports-related considerations." In support of their argument, plaintiffs point to §§ 392(a)(5) and (b) of the Act, which plaintiffs acknowledge "are not in terms applicable to the USOC,"[15] but rather concern situations in which national governing bodies of various sports,[16] which are subordinate to the USOC, are asked to sanction the holding of international competitions *below* the level of the Olympic or Pan American Games in the United States or the participation of the United States athletes in such competition abroad. These sections provide that a national governing body may withhold its sanctions only upon clear and convincing evidence that holding or participating in the competition "would be detrimental to the best interests of the sport." Plaintiffs argue by analogy that a similar "sports-related" limitation must attach to any authority the USOC might have to decide not to participate in an Olympic competition. We cannot agree.

The provision on which plaintiffs place reliance by analogy is specifically concerned

pute the fact, that these powers were primarily designed to give the USOC supervisory authority over United States amateur athletic groups in order to eliminate the numerous and frequent jurisdictional squabbles among schools, athletic groups and various national sports governing bodies.

14. *See* S.Rep. No. 770, 95th Cong., 2d Sess. 2 (1978); H.R.Rep. No. 95–1627, 95th Cong., 2d Sess. (1978), reprinted in [1978] U.S.Code Cong. & Admin.News, p. 7478.

15. Plaintiffs' Memorandum in Reply to Memoranda of the Defendant and the United States as *Amicus Curiae* and in Opposition to Defendant's Motion to Dismiss, at 5.

16. A national governing body is a non-profit amateur sports organization which acts as this country's representative in the corresponding international sports federation for that particular sport. It sets goals and directs policy in the sport it governs and has the power to sanction internal competitions held in the United States in their sport.

with eliminating the feuding between various amateur athletic organizations and national governing bodies which for so long characterized amateur athletics.[17] As all parties recognize, this friction, such as the well-publicized power struggles between the NCAA and the AAU, was a major reason for passage of the Act, and the provisions plaintiffs cite, among others, are aimed at eliminating this senseless strife, which the Senate and House Committee reports indicate had dramatically harmed the ability of the United States to compete effectively in international competition.[18] In order to eliminate this internecine squabbling, the Act elevated the USOC to a supervisory role over the various amateur athletic organizations, and provided that the USOC establish procedures for the swift and equitable settlement of these disputes. As indicated above, it also directed that the national governing bodies of the various sports could only withhold their approvals of international competition for sports-related reasons. Previously, many of these bodies had withheld their sanction of certain athletic competitions in order to further their own interests at the expense of other groups and to the detriment of athletes wishing to participate.

In brief, this sports-related limitation is intimately tied to the specific purpose of curbing the arbitrary and unrestrained power of various athletic organizations subordinate to the USOC not to allow athletes to compete in international competition below the level of the Olympic Games and the Pan American Games. This purpose has nothing to do with a decision by the USOC

to exercise authority granted by the IOC to decide not to participate in an Olympic competition.

In an attempt to escape this conclusion, plaintiffs seek to bolster their argument by pointing to an amendment offered by Congressman Drinan during consideration of this legislation by the House Judiciary Committee. That amendment would have prohibited the use of Federal funds [19] in support of United States athletic involvement in countries which engage in gross violations of human rights. Congressman Drinan clearly indicated he considered the Soviet Union as one such country. Plaintiffs argue that the defeat of the amendment by the Committee was an indication that the Congress meant the USOC to act independently of national policy, by implication supporting the view that any decision not to compete in the Olympics must be sports-related rather than related to national policy reasons. We cannot read that much into a single Committee's disposition of an amendment, which did not address the scope of the USOC's power to decide against fielding an American team for the Moscow Games or any other Olympics because of national interest considerations. To the extent we try to divine Congressional intent from its defeat, we find it equally as plausible that the Committee very well may have intended, as the Government has argued, to keep the USOC free of statutory restraints.

We therefore conclude that the USOC not only had the authority to decide not to send an American team to the summer Olympics, but also that it could do so for reasons not directly related to sports considerations.[20]

---

**17.** See S.Rep. No. 770, supra, at 2, 5–6; H.R. Rep. No. 95–1627, supra, at 7484–5.

**18.** See S.Rep. No. 770, supra, at 3; H.R.Rep. No. 95–1627, at 7482–83.

**19.** Congress authorized federal funding of $16 million "to finance the construction, improvement, and maintenance of facilities for programs of amateur athletic activity and to defray direct operating costs of programs of amateur athletic activity . . . ." 36 U.S.C. § 384(a). Although this funding has been authorized, it has never been appropriated. To date, the USOC has received no federal funding.

**20.** Resolution of this issue also disposes of plaintiffs' allegation that defendant violated the Act by breaching a duty to organize, finance, and control participation in the events and competition of the Olympic Games by United States athletes. Because defendant had the authority to decide not to send a team to compete in the summer Olympics, it could not have breached this duty, which does not arise and become relevant, when the USOC has decided that an American team will not participate in the Olympics.

**1190**

### (b) *Athletes Statutory Right to Compete in the Olympics*

Plaintiffs argue that the Act provides, "in express terms" an "Athlete's Bill of Rights,"[21] pointing to the following provisions in the Act's "objects and purposes" section, which directs that the USOC shall:

provide for the swift resolution of conflicts and disputes involving amateur athletes, national governing bodies, and amateur sports organizations, *and protect the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official to participate in amateur athletic competition.* (emphasis supplied).

36 U.S.C. § 374(8).

A similar provision is contained in § 382b, which provides that:

The [USOC] shall establish and maintain provisions for the swift and equitable resolution of disputes involving any of its members and relating to the opportunity of an amateur athlete, coach, trainer, manager, administrator, or official to participate in the Olympic Games . . or other such protected competition as defined in such constitution and bylaws.

■ Plaintiffs argue that the Report of the President's Commission on Olympic Sports,[22] which was the starting point for the legislation proposed, and the legislative history supports their argument that the statute confers an enforceable right on plaintiffs to compete in Olympic competition. Again, we are compelled to disagree with plaintiffs.

The legislative history and the statute are clear that the "right to compete," which plaintiffs refer to, is in the context of the numerous jurisdictional disputes between various athletic bodies, such as the NCAA and the AAU, which we have just discussed, and which was a major impetus for the Amateur Sports Act of 1978. Plaintiffs recognize that a major purpose of the Act was to eliminate such disputes. However, they go on to argue that the Presidential report, which highlighted the need for

strengthening the USOC in order to eliminate this feuding, made a finding that there is little difference between an athlete denied the right to compete because of a boycott and an athlete denied the right to compete because of jurisdictional bickering.

The short answer is that although the Congress may have borrowed heavily from the Report on the President's Commission, it did not enact the Report. Instead, it enacted a statute and that statute relates a "right to compete" to the elimination of jurisdictional disputes between amateur athletic groups, which for petty and groundless reasons have often deprived athletes of the opportunity to enter a particular competition. Sections 382b and 374(8) originated in Senate Bill 2727, and were adopted by the House of Representatives without change. We quote at length from the Senate Report, S.Rep. No. 770, *supra*, at 5–6, which clarifies beyond doubt the meaning of the language unsuccessfully relied on by plaintiffs:

#### Athletes' Rights

That section of S. 2727 relating to an athlete's opportunity to participate in amateur athletic competition represents a compromise reached in the amateur sports community and accepted by the Committee. Language contained in the first version of the Amateur Sports Act, S. 2036, would have included a substantive provision on athletes' rights. This provision met with strong resistance by the high school and college communities. Ultimately, *the compromise reached was that certain substantive provisions on athletes' rights would be included in the USOC Constitution, and not in the bill.* As reported, S. 2727 makes clear that amateur athletes, coaches, trainers, managers, administrators, and other officials have the right, which will be guaranteed in the Olympic Committee Constitution, to take part in the Olympic Games, the Pan-American Games, world championship competition, and other competition designated by the Olympic Committee.

.　　.　　.　　.　　.

---

**21.** Plaintiffs Reply Memorandum, *supra*, at 9.

**22.** I President's Commission on Olympic Sports, Final Report (1977).

Athletes are to be encouraged that this is a positive step forward. For the first time, their rights to compete in amateur athletic competition are legislatively being *recognized*. S. 2727 acknowledges that athletes must be given an opportunity to decide what is best for their athletic careers . . . . *[T]he decision should not be dictated by an arbitrary rule which, in its application, restricts, for no real purpose, an athlete's opportunity to compete.*

*Further, as differences between amateur sports organizations are settled, athletes will no longer be used as pawns by one organization to gain advantage over another.* The Committee feels that S. 2727, by establishing guidelines for the amateur sports community, will bring about a resolution of those controversies which have so long plagued amateur sports. With the coordinating efforts of the Olympic Committee, the vertical structure which S. 2727 promotes, and a cooperative attitude on the part of amateur sports organizations, athletes should, in the future, realize more opportunities to compete than ever before. (emphasis supplied).

The Senate Report makes clear that the language relied on by plaintiffs is not designed to provide any substantive guarantees, let alone a Bill of Rights. Further, to the extent that any guarantees of a right to compete are included in the USOC Constitution as a result of this provision, they do not include a right that amateur athletes may compete in the Olympic Games despite a decision by the USOC House of Delegates not to accept an invitation to enter an American team in the competition. This provision simply was not designed to extend so far. Rather, it was designed to remedy the jurisdictional disputes *among* amateur athletic bodies, not disputes between athletes and the USOC itself over the exercise of the USOC's discretion not to participate in the Olympics.

#### (c) *Statutory Cause of Action*

Plaintiffs argue that they have a private cause of action under the Amateur Sports Act of 1978 to maintain an action to enforce their rights under that Act. This argument assumes (1) the existence of a right and (2) the capability of enforcing that right by a private cause of action. As the foregoing discussion establishes, we have found that the statute does not guarantee plaintiffs a right to compete in the Olympics if the USOC decides not to send an American team to the Olympic Games and we have found that defendant has violated no provision of the Act. Thus, the "right" the plaintiffs seek to enforce under the Act simply does not exist. (Plaintiffs have pointed to no *express* private right of action in the statute, and none exists). Under these circumstances, we cannot find that plaintiffs have an implied private right of action under the Amateur Sports Act to enforce a right which does not exist.

 Assuming, *arguendo*, the existence of some right, such as the right to compete, plaintiffs still have the difficult task of demonstrating the existence of a private cause of action to enforce such right. "The question of the existence of a statutory cause of action is, of course, one of statutory construction. . . . [O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted . . . ." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). The Supreme Court recently has reaffirmed that the basic inquiry is one of Congressional intent, despite earlier cases indicating several areas of exploration.

It is true that in *Cort v. Ash* [422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26], *supra*, the Court set forth four factors that it considered 'relevant' in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of [those] factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action.

*Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 23, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979), quoting *Touche Ross &*

*Co. v. Redington, supra,* 442 U.S. at 575, 99 S.Ct. at 2489.

Our discussion of Congressional intent will be exceedingly brief, for we have indicated in the preceding sections that the legislative history of the Act reveals unequivocably that Congress never intended to give plaintiffs a right to compete in the Olympics if the USOC determines not to enter a team. It necessarily follows that Congress therefore did not intend to create an implied private cause of action under the statute allowing plaintiffs to sue to enforce a right to compete in the Olympics. To believe otherwise is to believe that by its silence Congress intended to confer a cause of action to enforce nonexistent rights. This we cannot do. Not only is the legislative history barren of any implication that Congress intended to confer an enforceable right to compete in the Olympics in the face of a decision by the USOC not to compete, but it is also barren of any implication that Congress intended to create a private cause of action in such circumstances.

As noted above, to the extent Congress provided protection for amateur athletes to compete, it did so in terms of eliminating the rivalries between sports organizations. For this reason, § 395 of the Act establishes detailed procedures for the USOC's consideration and resolution of jurisdictional and eligibility issues, subject to review by arbitration under 36 U.S.C. § 395(c)(1). Even for disputes covered by § 395, there is therefore no private cause of action.

Because we conclude that the rights plaintiffs seek to enforce do not exist in the Act, and because the legislative history of the Act nowhere allows the implication of a private right of action, we find that plaintiffs have no implied private right of action under the Amateur Sports Act of 1978 to maintain this suit.[23]

### 2. Constitutional Claims

Plaintiffs have alleged that the decision of the USOC not to enter an American team in the summer Olympics has violated certain rights guaranteed to plaintiffs under the First, Fifth and Ninth Amendments to the United States Constitution. This presents us with two questions: (1) whether the USOC's decision was "governmental action"(state action), and, assuming state action is found, (2) whether the USOC's decision abridged any constitutionally protected rights.

### (a) State Action

■ Although federally chartered, defendant is a private organization. Because the Due Process Clause of the Fifth Amendment, on which plaintiffs place great reliance, applies only to actions by the federal government,[24] plaintiffs must show that the USOC vote is a "governmental act," i. e., state action. In defining state action, the courts have fashioned two guidelines. The first involves an inquiry into whether the state:

---

23. Plaintiffs have also alleged as a cause of action that in addition to violating its governing statute, defendant USOC has also violated its Constitution and By-laws, injuring plaintiff Shaw, a member of USOC's Executive Board. In particular, plaintiffs argue in their memorandum, at 33, that the USOC has violated its corporate purpose of coordinating amateur sports so as to obtain the "most competent amateur representation" in the Olympic Games. This corporate purpose appearing in the USOC Constitution is identical to that appearing in the Act, § 374(4), and we have already found that defendant has not violated that statute. Just what other specific violations of the USOC Constitution and By-laws plaintiffs are alleging does not appear in the complaint or in the plaintiffs' memoranda. To the extent they allege violations of provisions also contained in the Act, we have already

determined that question. To the extent they involve a yielding to "political pressures," we note that on April 23, 1980 the IOC Executive Board reviewed the actions of the USOC and concluded that they were not in violation of IOC Rule 24(C), which requires that NOC's "must be autonomous and must resist all pressures of any kind whatsoever, whether of a political, religious or economic nature." To the extent that plaintiffs are alleging that defendant has violated any provision of its Constitution and By-laws requiring it to be autonomous, we adopt the conclusion of the IOC and find that this resolves any such allegations in favor of defendant.

24. *Public Utilities Commission v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952).

. . . has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity.

*Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961).

In *Burton,* the Supreme Court found state action, but it did so on wholly different facts than those existing here. The private entity charged with racially discriminating against plaintiff was a restaurant which was physically and financially an integral part of a public building, built and maintained with public funds, devoted to a public parking service, and owned and operated by an agency of the State of Delaware for public purposes. Noting the obvious and deep enmeshment of defendant and the state, the court found that the state was a joint participant in the operation of the restaurant, and accordingly found state action. Here, there is no such intermingling, and there is no factual justification for finding that the federal government and the USOC enjoyed the "symbiotic relationship" which courts have required to find state action. The USOC has received no federal funding [25] and it exists and operates independently of the federal government. Its chartering statute gives it "exclusive jurisdiction" over "all matters pertaining to the participation of the United States in the Olympic Games . . . ." 36 U.S.C. § 374(3). To be sure, the Act does link the USOC and the federal government to the extent it requires the USOC to submit an annual report to the President and the Congress. But this hardly converts such an independent relationship to a "joint participation."

The second guideline fashioned by the courts involves an inquiry of whether:

. . . there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself.

*Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

*Jackson* provides an indication of how close this nexus must be in order to find state action. In that case, the Supreme Court found there was no state action even though the defendant was a utility closely regulated by the state, and even though the action complained of (the procedure for termination of electrical services) had been approved by the state utility commission.[26] In the instant case, there was no requirement that any federal government body approve actions by the USOC before they become effective.

Plaintiffs clearly recognize this, but they argue that by the actions of certain federal officials, the federal government initiated, encouraged, and approved of the result reached (*i. e.,* the vote of the USOC not to send an American team to the summer Olympics). Plaintiffs advance a novel theory. Essentially, their argument is that the campaign of governmental persuasion, personally led by President Carter, crossed the line from "governmental recommendation," which plaintiffs find acceptable and presumably necessary to the operation of our form of government, into the area of "affirmative pressure that effectively places the government's prestige behind the challenged action," and thus, results in state action. We cannot agree.

Plaintiff can point to no case outside the area of discrimination law which in any way supports their theory, and we can find none. Furthermore, this Circuit's Court of Appeals has addressed what level of governmental involvement is necessary to find

---

**25.** Federal funds were authorized under the Amateur Sports Act of 1978 but have never been appropriated. But the mere receipt of federal funds by a private entity, without more, is not enough to convert that entity's activity into state action. *Spark v. Catholic University of America,* 510 F.2d 1277 (D.C.Cir. 1975).

**26.** The termination procedure was contained in a general tariff filed with the Public Utility Commission. The Commission approved the tariff without focusing on or specifically approving the termination provision.

state action in cases not involving discrimination.

Each party cites numerous cases dealing with the amount of governmental involvement which is necessary before a private entity becomes sufficiently entangled with governmental functions that federal jurisdiction attaches. If any principle emerges from these cases, it would appear to be that, at least where race is not involved, *it is necessary to show that the Government exercises some form of control over the actions of the private party.* (emphasis supplied).

*Spark v. Catholic University of America, supra,* at 1281–82.

Here there is no such control. The USOC is an independent body, and nothing in its chartering statute gives the federal government the right to control that body or its officers. Furthermore, the facts here do not indicate that the federal government was able to exercise any type of *"de facto"* control over the USOC. The USOC decided by a secret ballot of its House of Delegates. The federal government may have had the power to prevent the athletes from participating in the Olympics even if the USOC had voted to allow them to participate, but it did not have the power to make them vote in a certain way. All it had was the power of persuasion. We cannot equate this with control. To do so in cases of this type would be to open the door and usher the courts into what we believe is a largely nonjusticiable realm, where they would find themselves in the untenable position of determining whether a certain level, intensity, or type of "Presidential" or "Administration" or "political" pressure amounts to sufficient control over a private entity so as to invoke federal jurisdiction.

We accordingly find that the decision of the USOC not to send an American team to the summer Olympics was not state action, and therefore, does not give rise to an actionable claim for the infringements of the constitutional rights alleged.

(b) *Constitutionally Protected Rights*

■ Assuming *arguendo* that the vote of the USOC constituted state action, we turn briefly to plaintiffs' contention that by this action they have been deprived of their constitutional rights to liberty, to self-expression, to travel, and to pursue their chosen occupation of athletic endeavor. Were we to find state action in this case, we would conclude that defendant USOC has violated no constitutionally protected right of plaintiffs.

We note that other courts have considered the right to compete in amateur athletics and have found no deprivation of constitutionally protected rights. As the Government has pointed out in *Parish v. National Collegiate Athletic Association,* 506 F.2d 1028 (5th Cir. 1975), basketball players sought an injunction to prevent the NCAA from enforcing its ruling declaring certain athletes ineligible to compete in tournaments and televised games. The court, quoting *Mitchell v. Louisiana High School Athletics Association,* 430 F.2d 1155, 1158 (5th Cir. 1970), stated that:

. . . the privilege of participation in interscholastic activities must be deemed to fall . . . outside the protection of due process.

Plaintiffs have been unable to draw our attention to any court decision which finds that the rights allegedly violated here enjoy constitutional protection; and we can find none. Plaintiffs would expand the constitutionally-protected scope of liberty and self-expression to include the denial of an amateur athlete's right to compete in an Olympic contest when that denial was the result of a decision by a supervisory athletic organization acting well within the limits of its authority. Defendant has not denied plaintiffs the right to engage in every amateur athletic competition. Defendant has not denied plaintiffs the right to engage in their chosen occupation. Defendant has not even denied plaintiffs the right to travel, only the right to travel for one specific purpose. We can find no justification and no authority for the expansive reading of the Constitution which plaintiffs urge. To find as plaintiffs recommend would be to open the floodgates to a torrent of lawsuits. The courts have correctly recognized that

many of life's disappointments, even major ones, do not enjoy constitutional protection. This is one such instance.

At this point, we find it appropriate to note that we have respect and admiration for the discipline, sacrifice, and perseverance which earns young men and women the opportunity to compete in the Olympic Games. Ordinarily, talent alone has determined whether an American would have the privilege of participating in the Olympics. This year, unexpectedly, things are different. We express no view on the merits of the decision made. We do express our understanding of the deep disappointment and frustrations felt by thousands of American athletes. In doing so, we also recognize that the responsibilities of citizenship often fall more heavily on some than on others. Some are called to military duty. Others never serve. Some return from military service unscathed. Others never return. These are the simple, although harsh, facts of life, and they are immutable.