Grant Thomas SELFRIDGE, as President of the Eastern Rugby Union of America, Inc. and Stephen Arnsdorff, Individually and as a Member of the Eastern Rugby Union of America, Inc., Plaintiffs,

v.

The Honorable Hugh L. CAREY, as Governor of the State of New York, the State of New York, Erastus Corning, as Mayor of the City of Albany and the City of Albany, Defendants.

No. 81–CV–1005.

United States District Court, N. D. New York.

Sept. 22, 1981.

Lombardi, Reinhard, Walsh & Harrison, P. C., Schenectady, N. Y., for plaintiffs; Frederick K. Reich, Albany, N. Y., Harlan R. Harrison and Richard P. Walsh, Jr., Schenectady, N. Y., of counsel.

Robert Abrams, Atty. Gen. of the State of New York, Albany, N. Y., for defendants

Carey and The State of New York; Peter L. Yellin, Asst. Atty. Gen., Albany, N. Y., of counsel.

Steven R. Shapiro, Arthur N. Eisenberg, New York City, for The New York Civil Liberties Union as amicus curiae.

Lanny Earl Walter, Anita Thayer, Walter & Thayer, Albany, N. Y., for The Capitol District Coalition Against Apartheid as amicus curiae; George King, Albany, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

The plaintiffs seek both preliminary and permanent injunctive relief from this Court to insure the pursuit of their plans to meet the South African Springboks in a rugby match scheduled to take place in Albany, New York on Tuesday, September 22, 1981.

Plaintiffs' claims arise under both the First and Fourteenth Amendments, and 42 U.S.C. § 1983 (1976). Proper jurisdiction is conferred upon this Court by Article III, § 2 of the Constitution, and by 28 U.S.C. § 1343 (1976).

Prior negotiations between the Eastern Rugby Union of America, Inc., and the offices of the Mayor of Albany had established both the September 22 playing date, and the Bleecker Stadium site for the game. Not only is that stadium a public city-owned facility, but the security for the game was also to be provided by the City police department. Mayor Corning subsequently sought the option of supplemental security from Governor Carey. This additional request did not reflect Mayor Corning's opinion that security problems were insurmountable; rather the Mayor himself firmly stated that based on his available information, the proposed game plans seemed well in hand. (Statement of Mayor Corning at oral argument). The request, however, prompted an investigation by the Governor's office, which resulted in a press release on September 17, 1981. At that time, Governor Carey unequivocally stated that the rugby game could not be held in Albany.

That public communique and the supplemental affidavit provided by William G. Connelie, Superintendent of the New York State Police, stated that the game could create "widespread violence" and "imminent danger of riot and breach of the peace," yet neither document describes the intelligence procedures or the sources used to substantiate what otherwise appear as mere suppositions.

Although no additional data was introduced at the hearing, this Court was provided with the official intelligence report from Superintendent Connelie to Governor Carey, under instructions that it provided the entire basis for the Governor's decision. The report was strictly limited to in camera review.

Significantly, all of the sources discussed above acknowledge that extended security protection could be made available, but were limited by considerations of cost and timeliness of the request. In anticipation of further discussion herein, this Court finds such flexible handicaps wholly unacceptable to support a rationale for total prohibition of plaintiffs' rights.

II.

This Court's threshold inquiry must establish the existence of plaintiffs' constitutionally protected rights. The plaintiffs seek protection afforded by both the First and Fourteenth Amendments. Although expressions shielded by the First Amendment have traditionally been accorded primary status, they are neither absolute, *Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 473 (2d Cir. 1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), nor consistently easy to identify. *Southern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (protected theatrical productions); *Burstyn v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (protected motion pictures); *Schad v. Mount Ephraim*, —— U.S. ——, ——, 101

S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981) (protected nude dancing entertainment).

Considering the broad scope of the First Amendment, it is essential that this Court recognize the significance of contextual basis in measuring protected subject matter. Of course this has been best reflected in the traditional judicial "time, place and manner" analysis. With this in mind, it becomes obvious that any given activity may deserve more or less protection, depending on the unique operative facts.

The present case exemplifies perfectly the importance of context. While a superficial analysis exposes nothing more than a request to extend constitutional protection to a sporting event, this Court recognizes, in all candor, that this particular match has attracted extraordinary political prejudice, reflecting current global awareness of South Africa's apartheid policies. With this as a context, *DeFrantz v. United States Olympic Committee*, 492 F.Supp. 1181 (D.C. D.C.1980) is easily distinguishable. The plaintiffs there claimed both statutory and constitutional rights to compete in a foreign country under the auspices and funding of a legislatively created program. In both *DeFrantz* and its cited authority, *Parish v. National Collegiate Athletic Association*, 506 F.2d 1028 (5th Cir. 1975), plaintiffs sought to escape rigid athletic association guidelines by claiming broader constitutional principles; in both, the courts rejected plaintiffs' claims.

The present case clearly exceeds that narrower view. The plaintiffs here are members of a representative sports organization being thwarted in their plan to schedule an event on public land.

It is important to note here that it was the action of the Governor's office that prompted plaintiffs' request before this Court. Their affirmative choice to then seek judicial protection as a means of reinforcing their aims, has presented this Court with an added dimension to a First Amendment position.

At this juncture, a denial of a safe public forum would place the plaintiffs in stymied silence, and deprive them of their right to withstand political criticism by pursuing an activity which they choose to view as apolitical. Plaintiffs' intentional ignorance of the racial syntax involved here deserves First Amendment protections under *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1976). Chief Justice Burger carefully described that "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Id.* at 714, 97 S.Ct. at 1435, *citing Board of Education v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1173, 1185, 87 L.Ed. 1628 (1943).[1]

■ The First Amendment also insures protection of political or apolitical views through a right of association. *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1964), *citing NAACP v. Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958). The Court in *Griswold* recognized that the right to associate is more inclusive than the right to assembly, for it involves a contextual form of opinion expression through association which necessitates First Amendment guarantees. This Court has previously rendered an exhaustive analysis of First Amendment protections focusing on the right of association in *Delaware Peace Action Network v. Board of Supervisors*, 80–CV–582 (N.D.N.Y. Aug. 1, 1980). Even if plaintiffs' own views are not wholly political, that right of association nevertheless "pertains to the social, legal, and economic benefit of the members." *Griswold, supra*, 381 U.S. at 483, 85 S.Ct. at 1681; *Sawyer v. Sandstrom*, 615 F.2d 311, 316 (5th Cir. 1980).

Both the plaintiffs and the New York Civil Liberties Union further allege Fourteenth Amendment protections, which traditionally have supported First Amendment

---

**1.** The Court in *Wooley* then differentiated between affirmative acts and passive compliance in measuring constitutional significance. *Id.* 430 U.S. at 715, 97 S.Ct. at 1435. Surely the plaintiffs' affirmative request to engage in public activity without fear of political reprisal for supposed racial views imposed upon them by others merits judicial protection.

guarantees. This combined rationale figures prominently in protecting both an equality of access, and in preventing censure on the basis of content.

Because of the singularly dramatic nature of the racial issue involved in this case, any curtailment of the plaintiffs' rights strongly suggests censure on the basis of the content of the controversy. *Police Department v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

Similarly, it is not unreasonable to suppose that a total prohibition within the City of Albany might warrant a finding under equal access considerations of the Fourteenth Amendment.

Although both these positions appear to have merit, this Court specifically omits these related considerations from its rationale, finding sufficient constitutional protections under the First Amendment.

### III.

■ This Court acknowledges the Governor's duty to preserve the peace.[2] His discretionary powers, however, must be canalized within intelligible standards. *See Shuttleworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana, supra*, 379 U.S. at 555–58, 85 S.Ct. at 464–66; *Staub v. City of Baxley*, 355 U.S. 313, 321–25, 78 S.Ct. 277, 281–84, 2 L.Ed.2d 302 (1958); *Saia v. New York*, 334 U.S. 558, 560–62, 68 S.Ct. 1148, 1149–50, 92 L.Ed. 1574 (1948). Because First Amendment rights are involved here, the Governor's determination "must survive exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). First, the State bears the burden of justifying its prohibition. *Rosen v. Port of Port-*

*land*, 641 F.2d 1243, 1246 (9th Cir. 1981). Second, the Governor must establish "weighty reasons" for his ban. *Grayned v. City of Rockford*, 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–03, 33 L.Ed.2d 222 (1972). Third, and most importantly, the Governor must show that his prohibition is the least drastic means of protecting the governmental interest involved. *See id.* at 114–18, 92 S.Ct. at 2302–04; *Rosen, supra*, 641 F.2d at 1246.

The Governor's action here is subject to criticism on several counts. The Governor might have authorized greater protection for the players and spectators under Section 6 of the Military Law or Section 223 of the Executive Law.[3] Neither section, however, allows total suppression of a constitutionally protected activity. Instead, the Governor seemingly relied on his general executive powers to ban the game.[4] Moreover, the factual evidence supposedly substantiating the Governor's determination is woefully inadequate. Governor Carey's affidavit merely parrots his press release. Neither Superintendent Connelie's affidavit nor the confidential report supplied to the Court for in camera inspection provides a sufficient factual basis for the Governor's decision. The Court also rejects the State's implication, made during oral argument, that insufficient time exists to call out additional police forces. Finally, newspaper accounts of protests lodged against the Springbok tour in New Zealand, halfway around the world, are irrelevant to this Court's legal determination, based on the United States Constitution and laws.

■ Relying on this paltry showing, the Governor banned a lawful public assembly. Even if this Court were to accept the

---

2. *See* N.Y. Constitution Art. IV, § 3 (McKinney) (requiring the Governor to "faithfully execute[ ]" the laws, *i. e.*, preserve the peace.

3. N.Y.Mil.Law § 6 (McKinney) authorizes the Governor to call out the National Guard upon imminent danger of riot or breach of the peace. Similarly, he may direct the state police to "suppress rioting and disorder." N.Y. Exec.Law § 223 (McKinney) (Supp.1980).

4. N.Y.Exec.Law § 29–a (McKinney) (Supp. 1980), allowing the Governor to suspend temporarily specific provisions of any statute or law, would appear to accord the Governor authority to ban public activities in certain circumstances. The Governor, however, did not rely on this statute. Moreover, the statute's parameters are limited to disasters. *See id.* § 20(2)(a). Finally, even if § 29–a encompassed riots and breaches of the peace, it is specifically limited by federal constitutional protections.

State's reasons and even though the governmental interest may be substantial, a ban is certainly not the least restrictive means to protect the public and players from possible disturbances. *See Wooley v. Maynard, supra,* 430 U.S. at 716–17, 97 S.Ct. at 1436. In *Concerned Jewish Youth v. McGuire, supra,* 621 F.2d 471, the Second Circuit held, *inter alia,* that restrictions on demonstrations in front of the Russian Mission were reasonable in view of the Government's interest in protecting the Mission and the residents of the area. The court's factual findings supporting its conclusion were stronger than the Governor's here;[5] its remedy, far less drastic. The majority's position that the restrictive alternatives upheld were a "minimal inhibition" on communication, however, was sharply criticized in Judge Mansfield's dissent. *Id.* at 478–83. Surely, where the Second Circuit was divided on a much more compelling record, this Court cannot find merit in the Governor's position.

Because of Governor Carey's inability to secure a less restrictive alternative and his failure to substantiate the supposed need for a ban, this Court views his action as a prior restraint. As in *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1938), the Governor's decision totally prohibits plaintiffs from exercising their fundamental First Amendment rights. For this reason, it is unconstitutional.

By enjoining the scheduled sporting event, the Governor of the State of New York seeks to destroy the very constitutional freedoms that have ennobled the more than century long struggle to ensure racial equality in this country. The benefits of such a constitutional heritage must not be commanded by executive fiat, and extended or withheld on the basis of changing popular demand.

**5.** The Court noted:
There have been numerous instances of violence at the Russian Mission. In 1971 and 1976 shots were fired at and into the Mission. In 1975, containers of red paint were thrown at the Mission splattering paint on walls and

## IV.

In order to obtain injunctive relief, plaintiffs must make the required showing under *Jackson Dairy, Inc. v. H. P. Hood and Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979). Here, the plaintiffs have successfully demonstrated the primary requisite of irreparable harm. Clearly, a total ban on the rugby game in Albany leaves the plaintiffs bereft of purpose in practicing and planning for this public event. Such deprivation adequately meets the standard accepted in this Circuit.

Second, plaintiffs must either demonstrate the probability of success on the merits, or a balance of hardships tipping in their favor. Plaintiffs more easily satisfy the latter alternative. This Court has adequately considered the harsh inequities invoked by the Governor's executive fiat to prohibit any and all rugby activities between the plaintiffs and the South Africans in Albany.

## V.

■ The State has an affirmative duty to protect plaintiffs' fundamental First Amendment rights. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961). Failure to provide adequate safeguards against possible violence at the game will constitute unlawful State action in violation of the Fourteenth Amendment's equal protection clause. *See Williams v. Wallace,* 240 F.Supp. 100, 109 (M.D.Ala.1965); *United States v. U. S. Klans,* 194 F.Supp. 897, 902 (M.D.Ala.1961).

## VI.

Because plaintiffs now pray only for preliminary injunctive relief, it is unnecessary to consider claims arising under 42 U.S.C. § 1983 (1976). For these reasons, this Court hereby

doors. Finally, in 1977 and 1978 there were problems with unruly demonstrators in front of the Mission ... More recently, the Russian Mission was bombed for the first time. 621 F.2d at 475 (footnote omitted).

**698**

ORDERS that plaintiffs' motion for a preliminary injunction against the restraints imposed by Governor Carey be granted, and it be and is hereby further

ORDERED that defendants Governor Carey and Mayor Corning adhere to their constitutional duties to provide adequate security to insure the peaceful pursuit of plaintiffs' lawful endeavors for purposes of the rugby game between the plaintiffs and the South African Springboks.

It is so Ordered.